**In the Interest of W.G. and E.G.,**

**v.**

**P.L.G.**

**No. 57940.**

Missouri Court of Appeals,
Eastern District,
Division One.

Dec. 4, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 9, 1991.

---

Alan J. Agathen, Clayton, for appellant.

Nancy L. Sido, Clayton, for respondent.

PUDLOWSKI, Presiding Judge.

On January 11, 1990, the St. Louis County Juvenile Court issued an order after an evidentiary hearing, which terminated the parental rights of appellant, P.G. (mother) in her two children W.G. (born 6/1/84) and E.G. (born 8/23/85).[1] We affirm.

On appeal, mother raises two points: (1) that the trial court erred in basing its termination order partially on a prior adjudication of abuse or neglect, thereby violating the principles of res judicata and estoppel; and (2) that the trial court erred in ordering a termination of mother's parental rights in W.G. and E.G. because the order was "against the weight of the evidence and unsupported by competent and substantial evidence."

The following facts as disclosed by the record are relevant to this appeal. The juvenile court assumed jurisdiction of W.G. and E.G. on February 5, 1987, when mother admitted to having medically and nutritionally neglected the two children. The juveniles were placed in the legal and physical custody of the State of Missouri, Division of Family Services pursuant to § 211.031.1(1)(a). RSMo Cum.Supp.1989. A written service plan was agreed to and signed by mother with the Division of Family Services [hereinafter D.F.S.] on February 25, 1987, and the plan was filed with the court on September 24, 1987.

The service plan set forth eight requirements that mother "must do" to regain physical custody of both W.G. and E.G.: (1)

---

**1.** Mother also has a son, Aaron (approximately 2 years old) and a daughter, Penny (approximately 1 year old) who are not the subject of this order or appeal. The fathers of W.G. and E.G. are not involved in this appeal. A.S.D., the named father to W.G. and E.G., signed a notarized form on February 9, 1989, denying paternity and voluntarily terminating any parental rights he may have had in both children. A juvenile court order was issued on January 11, 1990, terminating his parental rights in both children and he has not appealed. J.U.Y., the legal father of E.G. had his parental rights terminated by a juvenile court order issued on January 11, 1990 and he has not appealed.

visits by mother at least twice a month, complying with the necessary notice requirements;[2] (2) mother obtaining a home with adequate space for her and her children; (3) mother obtaining parent counseling at a place approved by the social worker—regular attendance being required; (4) mother going to job training at a program approved by the social worker—regular attendance again being required; (5) mother making a day care or baby-sitting plan for when W.G. and E.G. would be returned to her; (6) mother filling out financial forms and if required to pay support for the children; (7) mother meeting with the social worker at least once a month to discuss mother's compliance with the service plan;[3] (8) mother notifying the social worker of any change in address, telephone number, job or people living in the home within ten days of making the change.

Two petitions were filed on August 1, 1989, seeking termination of P.G.'s parental rights in W.G. and E.G. respectively. Both petitions alleged similar grounds for terminating P.G.'s parental rights: (1) that W.G. and E.G. were formerly adjudicated to have been abused or neglected by mother and (2) that W.G. and E.G. had been under the continuing jurisdiction of the St. Louis County Juvenile Court for at least one year and the continuation of the parent/child relationship would greatly diminish each child's prospects for an early integration into a stable and permanent home.

The juvenile court's order on January 11, 1990, terminating mother's parental rights found the allegations contained in the two petitions as listed above to be true. The order also found that mother "has repeatedly and continuously failed, although physically or financially able, to provide the children with food, adequate clothing, shelter or other care and control necessary for the children's physical, mental or emotional health and development." The order also stressed the detrimental effects that continuing the parent/child relationship would have on W.G. and E.G. in their ability to integrate quickly into a stable and permanent home.

Specifically, the juvenile court found that mother freely, voluntarily and knowingly agreed to a social service plan with the D.F.S. on February 25, 1987; that mother knew and understood the provisions of the plan and the consequences of non-compliance; that mother failed to comply with the visitation requirements of the service plan; that mother failed to obtain suitable housing for herself and her children; that mother failed to attend job training; that mother failed to give her social worker a written day care plan; and that mother failed to meet with her social worker once each month. The juvenile court further found that to the extent that mother complied with the service plan these efforts proved unsuccessful in providing a continuing relationship between the mother and the children and furthering the ultimate goal of reunification of mother and her children (W.G. and E.G.). Finally, the juvenile court found that mother had failed on a continuing basis since February 5, 1987, to adjust her circumstances or conduct to provide a proper home for the children despite continuing efforts by the D.F.S. to aid her in doing so.

Our review of the record shows the following evidence adduced at the termination hearing to be especially probative. Terri Ann Fox, a D.F.S. social service worker, was assigned the W.G. and E.G. case in June of 1987. She monitored the children's placement in foster care, assisted mother in

2. Under the visitation terms of the service plan, mother was required to (a) "[c]all the D.F.S. social worker by the seventh day of each month to set up that month's visits;" (b) "[c]all the social worker the day before each visit (or the Friday before if the visit is on Monday) to say that she is coming to the visit. If the parent does not call the day before, that visit will not occur;" (c) "[i]f the parent cannot make it to a visit, the parent must call the social worker or supervisor at least two (2) hours before the visit.

If the parent does this, a new visit may be set up. The social worker will determine the time, length and place of all visits. The parent will get herself to the visits."

3. The service plan required that "[t]he parent must call the social worker by the seventh day of each month to set up the meeting. The social worker will choose the time and place of the meeting."

maintaining compliance with the service plan and also arranged and supervised visits between mother and the two children. Fox was assigned to this case until mid-October of 1989, but took a maternity leave from June 9, 1988, until August 25, 1988.

Fox testified at the termination hearing that she fully explained many times to mother what her obligations were under the service plan and that mother understood these requirements. Fox also testified that she explained the consequences of failing to fully comply with the service plan to mother—that D.F.S. would be forced to proceed with termination of mother's parental rights in both children.

In regard to the visitation requirement, Fox testified that mother did not fully comply—that between September 24, 1987, and August 1, 1989, mother failed to appear for a scheduled visit without calling to cancel twelve times and that from March 30, 1989, to October 23, 1989, mother visited the children only once. Fox stated that she continually encouraged mother to comply more fully with the visitation requirements throughout the time she was assigned to mother's case.

Sue Schneiders, a D.F.S. social service worker, who replaced Terri Fox, testified that mother made no visits to the children from the time she was assigned to the case (October 24, 1989) until the time of the hearing (December 18, 1989).

Jan Pullen, a D.F.S. social service worker and the supervisor of Fox, replaced Fox while she was on maternity leave between June 9, 1988 and August 25, 1988. During this time Pullen handled the "case management" of the W.G. and E.G. case. Pullen testified that during this time period, she twice reviewed the terms of the service plan with mother and also explained in detail the consequences of noncompliance. Pullen testified further that during the time she was directly in charge of the case, mother visited the children only twice and

that once mother failed to appear for a scheduled visit without calling to cancel.

In regard to the housing requirement of the service plan, Fox testified that during her term as social service worker mother resided in seven different houses/apartments all of which did not comply with the terms of the service plan. Fox testified that each of the seven residences did not comply with the service plan for various reasons including: being too small to accommodate mother's four children and not meeting the local occupancy and safety codes. At the time of the termination hearing, mother lived in a studio apartment which consisted of a kitchen, living room area and bathroom. This one-room apartment was described by Fox as "roach infested," "always cluttered," "trash and clothes all over the floor" and having "dirty dishes about the house and in the kitchen." Fox further described the present apartment building as being in great need of repair with the paint peeling and the stairs missing some steps.

In regard to the parent counseling requirement, Fox testified that mother did not fully comply with the service plan. Fox testified that several different types of counseling were arranged by her for mother and paid for by D.F.S.: (1) a home-based therapist who worked with mother from June of 1987, through December of 1987, but whose services were terminated because the contract with D.F.S. expired; (2) parenting classes which were not home-based and where mother had to provide her own transportation. Fox testified that mother was "very much interested in attending" but never went to any of the classes; (3) parent counselling through the Family Resource Center meeting with Randy Romanchek from August of 1988, through June of 1989, and then with Peggy Allen Lewis until the time of the termination hearing. These services were again paid for completely by D.F.S. Lewis testified that she met with mother for weekly sessions in mother's home;[4] (4) homemak-

---

4. Lewis testified further that during these counselling sessions she observed "marginal housekeeping" and that "there would often be things on the floor that did not belong on the floor."

When asked if she could see any improvement in mother's "parenting," Lewis observed that any improvement would be short-lived and difficult to maintain.

er services arranged by Fox for mother with Lillie Williams through Human Development Corporation. This program lasted from February of 1989, until May of 1989, after which mother refused to further cooperate in this program.[5]

Fox testified that mother did not comply with the job training requirement of the service plan. Mother enrolled in September of 1988, in the Personal Business College in the City of St. Louis but she voluntarily quit the program. Fox testified further that mother never asked about any other job training programs. Jan Pullen testified that she was never asked by mother to approve any job training program.

In regard to the required monthly meetings with the social service worker, Fox testified that while she was handling mother's case mother scheduled five meetings and then failed to attend. In fact, Fox met with mother for this required monthly meeting on only one occasion. Pullen testified that mother failed to schedule any meetings with her to comply with the monthly meeting requirement. Pullen was forced to initiate the scheduling of the monthly meetings but mother failed to attend two of the mutually arranged meetings.

Fox testified that mother failed to comply with the requirement that she submit a written day care plan for when she resumed custody of W.G. and E.G. Pullen also testified that mother never asked for any day care references during the time she was providing direct services to the case and mother never submitted a day care plan—either verbal or written.

■ The juvenile court's termination of mother's parental rights shall be sustained unless there is no substantial evidence to support its judgment, the judgment is against the weight of the evidence, or the judgment erroneously declares or applies the law. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984). In a court-tried case, the trial judge must decide that the evidence clearly, cogently, and convincingly demonstrates the existence of one of the conditions forming the basis for the termination petition. *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985). The clear, cogent and convincing standard of proof is met when the evidence "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *R.L.P. v. R.M.W.*, 775 S.W.2d 167, 169 (Mo.App.1989). This standard of proof may be met even if the court has contrary evidence before it; meaning that evidence in the record which might have supported a different conclusion does not necessarily demonstrate that the trial court's determination is against the weight of the evidence. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984).

■ Appellant's first point alleges that the principles of res judicata and estoppel were violated by the trial court when it based its termination order partially on a prior adjudication of abuse or neglect. This point is without merit.

Section 211.031 RSMo Cum.Supp.1989, which provides for the jurisdiction of the juvenile court in a neglect and/or abuse adjudication does not exist in competition with § 211.447 RSMo Cum.Supp.1985, which allows for the permanent severance of the parent-child relationship. These two statutory sections address different circumstances and therefore cannot be considered to be the same cause of action having res judicata or estoppel effect. Further, the Missouri Supreme Court has determined that a prior neglect adjudication may be used as partial support for a termination order. *In interest of L.G.*, 764 S.W.2d 89, 93–94 (Mo. banc 1989).

■ Appellant's second and final point alleged that there was not competent and substantial evidence to support a termination of mother's parental rights in W.G. and E.G. We disagree.

---

5. Williams testified that she taught mother parenting skills, budgeting in the home, hygiene techniques and meal preparation with nutrition. Williams also testified that she observed "dirty dishes piled in the sink, trash and clothes scattered all about the house ... [t]he couch was filthy, [t]he floors were filthy." Williams stressed that even when some progress was made, it never lasted for very long.

Mother was adjudicated in February of 1987, to have neglected her children W.G. and E.G. and they were placed in foster care. The case came under the continuing jurisdiction of the juvenile court and a service plan was agreed upon by mother and the D.F.S. The court's oversight and the D.F.S. service plan were designed to facilitate the eventual reunification of the mother, P.G., with her two children. Mother testified that she understood fully the provisions of the service plan and the consequences of her failing to comply with all of its requirements. Mother was fully aware that her parental rights in W.G. and E.G. could eventually be terminated if she did not comply with the service plan and achieve the desired goal of a "stable and permanent home."

It must be understood that the foremost principle underlying a termination of parental rights proceeding is the best interests of the child. *In re M.E.W.*, 729 S.W.2d 194, 195 (Mo. banc 1987). The evidence as contained in the record before this court is clear and convincing that the two children would each not benefit from a continued parent-child relationship and that such continued relationship would in fact diminish each child's prospects for an early integration into a stable and permanent home. D.F.S. has gone to great efforts to achieve a reunification of mother with W.G. and E.G. but at some point this goal of reestablishing custody in the biological mother, P.G., must yield to the best interests of the children W.G. and E.G.[6] That point has been reached and we find the termination order of the juvenile court to be supported by clear and convincing evidence.

Judgment affirmed.

KAROHL and GRIMM, JJ., concur.

---

6. Appellant alleges that this termination is based on mere "technical" violations of the service plan. We disagree with this characterization. Each of the eight requirements of mother were specifically agreed to by mother. Further, mother understood the consequences of a violation of these requirements. Finally, there was substantial testimony demonstrating significant violations of five of the eight requirements (visiting, housing, parental counseling, job training and meeting with the social worker).