253 S.W.3d 594 (2008)
In the Interest of E.A.C., a child under seventeen years of age.
No. 28412.
Missouri Court of Appeals, Southern District, Division Two.
May 29, 2008.
Michael L. Jackson, Jackson, for Appellant.
*595 Daniel F. Norton, Sikeston, for Respondent Scott County Juvenile Office (No brief filed).
BEFORE LYNCH, C.J., RAHMEYER, J., and BURRELL, J.
PER CURIAM.
Susan Lynn Cabaniss ("Mother") appeals from a Judgment and Order terminating her parental rights to her infant daughter, E.A.C., entered by the Circuit Court of Scott County, Missouri, Juvenile Division, on January 19, 2007. A parent's right to raise her children is a fundamental liberty interest protected by the constitutional guarantee of due process and is, in fact, one of the oldest fundamental liberty interests recognized by the United States Supreme Court. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Mother has alleged a serious violation of her due process rights occurred when the trial court denied her the opportunity to present evidence in her own defense at the termination of parental rights ("TPR") hearing.[1] We agree that Mother's due process rights were violated and reverse the judgment terminating Mother's parental rights.

Background
To aid in our understanding of the constitutional violation, we shall set forth a brief history of the events which brought the child into the custody of the court and the procedural court history. E.A.C. was born at Southeast Missouri Hospital in Cape Girardeau, Missouri, on December 29, 2005, to Mother and her then husband, Jeffery Cabaniss ("Father"). At the time of E.A.C.'s birth, Mother and Father were living as husband and wife in Chaffee, Missouri, along with their seven-year-old daughter Jaylynn.
It is undisputed that on February 9, 2006, Mother received a phone call from Jaylynn's school saying that she was sick and needed to be picked up from school. Mother prepared to leave with E.A.C. to go and pick up Jaylynn. After signing Jaylynn out of school, Mother took both girls back to their home. E.A.C. had not been fed at that point and Jaylynn was also hungry. E.A.C. was injured in the home and Mother sought medical care for the child, who was taken by paramedics in an ambulance to Southeast Missouri Hospital.
The Division became involved on February 9, 2006, when the agency received an emergency child abuse hotline call stating that E.A.C. was brought to Southeast Missouri Hospital's emergency room with a skull fracture. The hotline caller, a mandated reporter, indicated that Mother had told emergency room personnel that her seven-year-old daughter had dropped E.A.C. on a ceramic floor. At the time the hotline call was made, E.A.C. was being transferred to St. Louis Children's Hospital.
The next day, Chuck Grubbs, an employee of the Division, received a call from Dr. Marie Spivey, the attending physician at St. Louis Children's Hospital working with E.A.C. Dr. Spivey indicated that she had great concern for E.A.C. due to the fact that the parents could not provide the doctors with any history on how the child may have received a second fracture. She, therefore, felt she had reasonable cause to *596 suspect that the child was a victim of maltreatment. Dr. Spivey created and signed an affidavit to this effect, which was given to the juvenile division on February 11, 2006. Based on the affidavit, the Juvenile Division filed a petition for protective custody on February 14, 2006, alleging that E.A.C. was the victim of abuse in that "[t]he infant while in the custody of her parents received injuries to the head (skull fractures) that was [sic] not consistent with the information received by medical staff at the hospital from the parents." The court granted the Division protective custody of E.A.C. on February 14, 2006, finding that "while in the custody of the parents the child suffered [sic] injury to head."
Mother and Father were both arrested for abuse of a child and endangering the welfare of a child. Mother was in jail from March 13, 2006, through May 17, 2006, at which point she was released on bond. Mother was originally represented by the same counsel who was representing Father. That counsel later withdrew from representing Mother due to irreconcilable differences that had arisen between Mother's and Father's versions of what had happened.[2] Due to her counsel's withdrawal, Mother requested a continuance of the adjudication hearing, which was granted, and the hearing was continued to April 20, 2006. At that time, Mother indicated to the court that she could not afford counsel and asked that the court appoint counsel for her. Mother stated that her parents paid for her criminal attorney. The judge declared, "Well, maybe somebody needs to pay for another lawyer, too, or they can be the same lawyer in the same case." He further indicated, "you can't have a paid lawyer in one case and a free lawyer in the other case," but did not seek any income and expense statement or statement of available assets.[3] The trial court determined that Mother did not qualify for an attorney in her juvenile court case because she had been able to acquire an attorney in her criminal case and a tax refund received in February had been spent on the criminal lawyer and bills.[4]
On May 23, 2006, the adjudication hearing was held. Mother was still unable to afford an attorney, however, the court renewed its previous finding that Mother did in fact have the resources to get an attorney but had chosen not to. Specifically, Mother had just been released from jail the Wednesday before the hearing. When the court asked her how she got out of jail, Mother responded "[m]y mom and dad got me out." The court then asked, "So they want to get you out of jail, but they didn't want to get you a lawyer." When she explained that her parents had to get a loan to get bond money and could not afford another lawyer, the court responded, *597 "All right. Well, based upon that, I can make a finding you have the resources to get a lawyer. You're just not getting one. Because if you can get a lawyer in a different case, you can get a lawyer in this case." The hearing proceeded against Mother without the benefit of an attorney to represent her.
The adjudication hearing consisted primarily of the testimony of Terry Isaacs, an employee of the Division, who reviewed his entire investigation and his findings and his conclusion that Mother never provided an explanation as to how E.A.C. could have received a second skull fracture. It is interesting that it was Father who provided to Isaacs the explanation that, given the appropriate amount of force, could have caused the second skull fracture when he indicated to Isaacs that the child had fallen off Father's chest when Father had the child sleeping with him in the bed. There was medical evidence that Mother sought medical attention for that fall but x-rays were not taken at the time. Father related another event in which Mother hit the child's head on a doorway when she was going through it, but Father indicated that there was only a small red mark and no medical attention was sought at that time. Additionally, during the testimony of Isaacs, the affidavit of Dr. Spivey was admitted and received into evidence.[5] Jennifer Cabaniss, the aunt with physical custody of E.A.C., testified to E.A.C.'s current condition and also was allowed to introduce a statement of what Father told Jennifer that Jaylynn had said regarding how E.A.C. had been injured.[6]
Mother was allowed to give a statement to the court and was cross-examined by opposing counsel. At the end of the hearing, the court made a finding that "the infant while in the custody of the parents received injuries to the head that were no[t] consistent with the information supplied to the medical staff at the hospital from the parents." The findings from the adjudication hearing were in a document entitled "Order."[7] Approximately five months later, a petition for the termination of Mother's parental rights was filed.
After a dispositional hearing, Mother made further requests for an attorney. The juvenile officer stated, "You just entered an order of disposition. Unless she *598 is wanting to file some kind of motion or something before the Court, I'm not sure what purpose can be served at this point for counsel. We haven't filed a TPR." Mother questioned, "TPR. When you are talking legal terms, I'm not understanding them." Mother made complaints that she was being denied visitation and that they were canceling family support team meetings because members were showing up late. The court responded by saying, "As to whether or not you understand those things, do you want me to order a mental health examination to see if you are competent? Is that what you want me to do?" Mother had to explain that there was no communication with her by the family support committee. The court informed her that until her criminal case was completed that "they do not have a plan to reunify you and the child." When Mother asked why there was no visitation with either of her children, Mother was informed that Father had custody of the older child and Mother had to deal with him in a different forum and that she was not seeing E.A.C. because it was a condition of her bond.[8]
E.A.C. remained in protective custody from February 14, 2006, until the TPR hearing in January, 2007. Mother was never allowed visitation due to an erroneous claim that her bond in the criminal case mandated no visitation, nor were any efforts made by any agency to reunite Mother with E.A.C. There was never a treatment plan of any sort implemented with Mother. At the time of the TPR hearing, Mother had a court-appointed attorney ("Counsel"). Counsel moved to dismiss the TPR petition or set aside the jurisdictional hearing ruling on two grounds: first, that the court erred by failing to appoint Mother an attorney at critical stages of the proceedings; and, second, that there was valuable evidence withheld from the court at the jurisdictional hearing. The court overruled the motion and proceeded with the termination of parental rights as to Mother.[9] The court indicated, in response to Counsel's objections, that Mother had an opportunity to obtain counsel, that the documents which Mother wanted to be considered by the court were in evidence at the jurisdictional hearing, and that the prior order from the adjudication hearing, though not denominated a "judgment," did contain the word judgment in a paragraph and, therefore, was a final judgment, which presumably should have been appealed.
One witness appeared for the Juvenile Division at the TPR hearing, Nichole Martindale. Martindale was an employee of the Division. She had not investigated the allegations of neglect but was the case manager and prepared a social summary for the hearing. The basis of her opinion that Mother's parental rights should be terminated consisted of testimony that it would be in the best interest of the child to terminate the parental rights of Mother. She further testified she did not feel the child would be safe in the home. She did not testify to any statutory basis for the termination of parental rights but did not have any disagreement with the juvenile officer's question, "Do you have any reason to believe that E.A.C. was not abused as adjudicated or determined by this Court?" She admitted that there had never been any reunification efforts between Mother and child.
During the TPR hearing, Counsel, on behalf of Mother, attempted to introduce *599 evidence, including the medical records from Southeast Missouri Hospital showing that the doctors originally had no suspicion of abuse; however, the court did not allow the evidence to be presented.[10] Mother attempted to show that the second injury, which the lack of explanation for caused the concern of the hospital personnel, was explained in various manners by Father. Specifically, Father claimed that he caused the second fracture in an earlier statement to the police and changed his story after his bond was reduced. Mother denied having any knowledge of how the child was further injured other than recounting that Jaylynn had dropped the baby.[11] Father related that there was one night in January where he fell asleep with E.A.C. on his chest and when he woke up and rolled to the left, E.A.C. rolled off of his chest. Although E.A.C. landed on a pillow next to the bed, Father suggested that when she fell she may have caught her head on the edge of the bed railing itself. Isaacs discovered through a review of the medical records that after this incident Mother took E.A.C. to a nurse practitioner to be checked out and indicated the baby had fallen off of the bed. Father, as noted, did provide another possible explanation regarding how E.A.C. might have received further injury. He recalled an incident where Mother was holding E.A.C. and walked through a doorway and hit the baby's head on the door frame; however, Father testified that the incident involved the left side of E.A.C.'s head which is inconsistent with the fact that E.A.C. received two skull fractures to the right side of her head. Mother denied this had occurred at all.
Mother tried to admit evidence that Jaylynn consistently stated that the baby fell from her lap. Although Jaylynn never testified in any of the proceedings, she did give a statement to Isaacs. She told him that when she was at home, she was sitting on the couch in the living room holding the baby. Mother was in the kitchen cooking some lunch. Jaylynn said that she started to get off of the couch to go to the restroom and the baby rolled off of her knee and onto the floor. Jaylynn also reenacted the scenario for Isaacs, and Isaacs measured that E.A.C. fell approximately seventeen inches from the top of Jaylynn's knees to the floor below. Jaylynn also told the school principal, Isaacs,[12] and others *600 that the baby fell when Jaylynn was holding her.
The court noted that it overruled Mother's offer of evidence and "made the decision that the child was abused based upon testimony received from one, [Father] at the time of the [adjudication] hearing, and the other documents and records of the Division of Children Services," and the court was not going to hear evidence that would change that finding. It is this failure of the trial court to allow Mother to present any evidence in her defense against the allegations of her abuse of E.A.C. and the court's refusal to even consider that evidence that gives rise to this appeal and was a clear violation of Mother's due process rights.

Analysis
Mother presents one point on appeal claiming several errors. Mother's claims include allegations that (1) the trial court erred in finding that the grounds to terminate parental rights under sections 211.447.2(1), 211.447.4(2)(c), and 211.447.4(3) were supported by clear, cogent and convincing evidence; (2) the trial court erred in proceeding with the TPR hearing because the child had not been in foster care for at least fifteen of the most recent twenty-two months as required under section 211.477.2(1); (3) the trial court erred by relying on the prior finding of abuse and neglect in the adjudication phase and by not allowing Mother to present evidence on the issue of abuse in the TPR hearing; and (4) the trial court failed to make proper findings with respect to whether Mother is chemically dependant or suffers from a mental condition which would render her unable to provide care, custody and control of her child.
Although points relied on that attempt to present multifarious claims violate Rule 84.04(d)[13] and ordinarily do not deserve the review of an appellate court, we gratuitously review Mother's point due to the gravity of the termination of parental rights. In re C.N.H., 998 S.W.2d 553, 559 n. 2 (Mo.App. S.D.1999); In Interest of S.J.G., 871 S.W.2d 638, 641 (Mo.App. S.D. 1994); In Interest of F.M., 979 S.W.2d 944, 947 (Mo.App. S.D.1998); In re S.L.N., 8 S.W.3d 916, 921 (Mo.App. S.D.2000). Mother has presented multiple meritorious claims of error by the trial court; however, we find the denial of due process by not allowing Mother to present evidence at a TPR hearing to be dispositive and, therefore, will not address the alternate claims presented.
In order to terminate parental rights, the court must adhere to a two-step procedure. In re K.M.C., III, 223 S.W.3d 916, 922 (Mo.App. S.D.2007). First, the court must find that there exists clear, cogent, and convincing evidence that one or more statutory grounds for termination exist. Section 211.447.5; K.M.C., 223 S.W.3d at 922. "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005). Although there are many possible grounds that could exist to support termination, "[t]he presence of evidence to support one statutory ground for termination is sufficient to terminate a parent's rights." Id. The second step requires the court to determine whether, by a preponderance of the evidence, the termination *601 will be in the child's best interest. Section 211.447.5; K.M.C., 223 S.W.3d at 922-23.
Regardless of whether or not statutory grounds exist to terminate parental rights, "[t]he state cannot intervene in the parent-child relationship, such as proceedings to terminate parental rights, absent procedures that meet the requisites of due process." C.J.G. v. Missouri Dept. of Social Services, 219 S.W.3d 244, 247-248 (Mo. banc 2007) (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). "`Due process' encompasses those guarantees found in the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 10 of the Missouri Constitution." Id. n. 5. The Supreme Court has held that:
For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "Unlike some legal rules" . . . due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is, therefore, an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation. . . .
Id. (quoting Lassiter v. Department of Social Services of Durham County, 452 U.S. 18, 24-25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (internal citations omitted)).
Where, as here, a fundamental right is involved, this Court must be diligent to uphold the requirements of due process and protect the parent's fundamental liberty interest in the parent-child relationship. The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing. In re A.M.F., 140 S.W.3d 201, 205 (Mo.App. S.D.2004). It is clear to this Court that in order to protect this fundamental right, due process requires that the parent, whose rights are threatened, must be given an opportunity to defend the allegations against them.
In order for this case to have reached the conclusion that termination of parental rights was in the best interest of the child, there should have been two separate findings by the circuit court, once in the adjudication stage and again at the TPR hearing. This is true because
[s]ection 211.031 RSMo Cum.Supp. 1989, which provides for the jurisdiction of the juvenile court in a neglect and/or abuse adjudication does not exist in competition with § 211.447 RSMo Cum. Supp.1985, which allows for the permanent severance of the parent-child relationship. These two statutory sections address different circumstances and therefore cannot be considered to be the same cause of action having res judicata or estoppel effect.
W.G. v. P.L.G., 801 S.W.2d 85, 89 (Mo.App. E.D.1990).
In this case, however, there were not two findings of abuse and neglect. In fact, the trial judge explicitly stated that he would not be considering evidence that would change his prior finding of abuse and neglect. By adopting a previous finding of abuse and neglect at the adjudication hearing and refusing to consider further evidence, the court denied Mother her due process rights and violated section 211.447.6, which states the juvenile court may terminate the rights of a parent to a child "when it appears by clear, cogent and convincing evidence that grounds exist." Section 211.447.6; Interest of K.T.K. v. Crawford County Juvenile Office, 229 S.W.3d 196, 200 (Mo.App. S.D.2007); In re *602 N.M.J., 24 S.W.3d 771, 781 (Mo.App. W.D. 2000). The failure to allow a presentation of Mother's evidence is particularly troubling in this case where there was certainly substantial evidence that the precipitating injury that caused the child to come into the Division's care came about when the child's sister was holding her and the other may have occurred while Father was holding the child.[14] Additionally, it must be noted that the petition and the order did not allege or find that Mother had abused the child, but rather, that while in the custody of the parents, the child received injuries to the head that were not consistent with the information supplied to the medical staff at the hospital from the parents. Mother attempted to supply information concerning a second injury to the head, but by the time of the TPR hearing, the trial court found that initial determination was an unrebuttable finding that Mother had abused the child.
This Court finds that Mother's due process rights were violated when the trial court denied her the opportunity to present evidence on the issue of whether Mother abused or neglected the child. This error is made more egregious by the fact that the trial court refused Mother an attorney at critical stages of the judicial process, held a critical hearing where Mother was not represented by legal counsel, and then used its findings from that hearing as res judicata on the critical issue of whether Mother had abused the child. We, therefore, reverse the judgment terminating Mother's rights and remand for further proceedings consistent with this opinion.
NOTES
[1] The Missouri Children's Division ("the Division") did not file a brief responding to Mother's appeal. Although there is no requirement that the Division file a brief, its failure to do so leaves us without the benefit of the Division's argument, if any, to support the trial court's decision. Bowers v. Director of Revenue, 193 S.W.3d 887, 888 n. 2 (Mo.App. S.D.2006).
[2] Although the record is not clear, it seems to indicate that at some point Father decided to testify against Mother and, upon giving further information to investigators regarding incidents of abuse by Mother, Father received favorable treatment including a reduced bond.
[3] During the dispositional hearing, the Division's counsel testified that Mother had provided "financial statements prior to the adjudication," however, we have not been able to locate anywhere else in the transcript where this was discussed previously. There is testimony where the judge asked Father to provide this information, but not Mother.
[4] The record does not reflect specifically where the tax refund was spent or who had control of the funds. Mother testified that "[w]e paid bills. We gave $1,500 of it to Mercedes Fort [the previous attorney]." It is unclear whether Mother worked outside of the home during the marriage; there was testimony that Mother was the "primary caregiver" of E.A.C.
[5] This is one of the many instances where Mother, who was untrained in the law, failed to make an objection that the affidavit lacked a proper foundation. We are not addressing the alleged error in not appointing counsel for Mother, but this certainly highlights the importance of legal representation at each of the critical stages.
[6] It appears that this out-of-court statement was apparently the only evidence that there was any indication that the child had been injured in any manner other than the fall from Jaylynn. Despite that, at the TPR hearing, the court remembered that testimony and referenced it from the first hearing.
[7] The designation of this document as an Order was significant because throughout the TPR hearing, the juvenile officer argued that Mother should have appealed the finding from the adjudication hearing and, because she did not, it was "res judicata" and the court could not revisit the issue of whether the child was abused. The court agreed with the juvenile officer's analysis and continuously denied the admission of any evidence from Mother relating to a finding of abuse or to personally reconsider its earlier finding regarding abuse. The trial court based his decision that its finding at the adjudication hearing had preclusive effect because the words containing an indication that this was a judgment were contained in the "second paragraph on the first page of that order in which it says, `The Court being fully advised of and concerning the premises makes the following findings of fact and judgment upon clear, cogent, and convincing evidence.'" We direct the court's attention to In re B.C., 991 S.W.2d 179, 181 (Mo.App. S.D.1999), for further analysis of this argument.
[8] As a matter of fact, there was no term in Mother's bond that she not have any visitation with her children. There was a condition that she not "tamper with a witness."
[9] Father voluntarily relinquished his rights to E.A.C. prior to the TPR hearing and the court accepted his relinquishment of his parental rights.
[10] Counsel argued that it was imperative for him to build a record including the evidence that was withheld in the previous hearings for purposes of appeal. The court did allow Counsel to make several lengthy offers of proof in order to provide this Court with a complete, albeit confusing, record. An offer of proof, however, is not evidence and it is clear from the record that the trial judge had absolutely no intention of reviewing further information so far as it pertained to his previous findings of abuse.
[11] In Isaacs' notes regarding the Cabaniss investigation, dated March 8, 2006, he noted that Mother did say "well the baby did fall off the bed about a month before Jaylynn dropped her." These notes were part of the juvenile division file, admitted at the TPR hearing as Respondent's Exhibit G, and made a part of the record for the offer of proof under Mother's Motion to Dismiss the Petition for Termination of Parental Rights and Motion to Set Aside, Reconsider, or Reopen Jurisdictional Hearing for Additional Evidence, which were previously overruled by the court.
[12] We note that Isaacs concluded that, based on his training in the investigation of abuse and neglect cases, the fall, as reenacted and described by Jaylynn, could not have caused the types of injuries that had occurred to six-week-old E.A.C. He drew this conclusion even though he was not able to present any direct evidence that E.A.C. was injured by any other method. Again, we note that no objections were made at the adjudication hearing to Isaacs' conclusion despite the fact that no foundation had been laid as to his expertise or even his job title or job experience.
[13] All rule references are to Missouri Court Rules (2007), and all references to statutes are to RSMo 2000, unless otherwise specified.
[14] There is no claim that the parents failed to seek medical care for either injury.