In the Interest of R.P.C., M.C. and D.C., Appellants,

v.

WRIGHT COUNTY JUVENILE OFFICE and Missouri Department of Social Services, Children's Division, Respondents.

No. 27790.

Missouri Court of Appeals, Southern District.

March 19, 2007.

Application for Transfer Denied April 10, 2007.

Application for Transfer Denied May 29, 2007.

Daniel E. Kirsch, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Kathleen R. Robertson, for respondent.

DANIEL E. SCOTT, Judge.

■ Appellants Mother and Father ("Parents") appeal the termination of their parental rights. Our review is guided by established principles:

> "The trial court's decision to terminate parental rights will be sustained on appeal unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law. In our review, we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. Furthermore, the standard of proof may be satisfied even though the trial court has contrary evidence before it or evidence in the record might support a different conclusion. 'In our review, we consider all facts and reasonable inferences therefrom in a light most favorable to the judgment below, and we will reverse "only when we firmly believe that the judgment is wrong." ' "

*In re A.K.F.,* 164 S.W.3d 149, 151–52 (Mo. App.2005) (citations omitted). Guided thereby, we summarize the evidence in part:

Parents brought Child, then age two, to the hospital in February 2002. He was covered with feces and dog hair, and tested positive for barbiturates.[1] Mother also

---

1. At that time, Father had a prescription for barbiturates. Mother indicated Father had

said someone had blown marijuana smoke into Child's face. The Children's Division took Child into custody and placed him in foster care. For the next eight months, Parents visited Child regularly, brought him gifts, and provided some non-monetary support.

Parents voluntarily signed away their parental rights in early 2003 so Child's grandmother could adopt Child. This plan ended in November 2003 after Child reported his grandmother burned him with cigarettes and stomped him, breaking his collarbone. Child was returned to his original foster family; the order terminating parental rights was withdrawn;[2] and Parents were notified they could start visiting Child again. They did not do so.

For the next fifteen months, Parents never tried to visit, contact, or communicate whatsoever with Child. In February 2005, the State petitioned to terminate parental rights on abandonment and other grounds. The trial court did so in December 2005, concluding it was in Child's best interest and finding multiple statutory grounds therefor.

■ Only one statutory ground need be proven by clear, cogent, and convincing evidence to affirm this judgment. *In re N.L.B.*, 145 S.W.3d 902, 906 (Mo.App. 2004). We conclude that abandonment was so proven, in that for at least six months, Parents "without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." RSMo § 211.447.4(1)(b).[3]

■ Abandonment means " 'an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection.' " *In re P.G.M.*, 149 S.W.3d 507, 514 (Mo.App. 2004) (citation omitted). The question is whether Parents intentionally withheld care, love, protection, and their presence from Child, thereby abandoning him. *Id.* Parental intent here is largely inferred from parental conduct; actions before and after the six-month statutory period also can be considered. *Id.* Abandonment can be found despite Child's involuntary removal if Parents' subsequent " 'lack of involvement goes beyond what is attributable to the estrangement and discouragement caused by the enforced separation.' " *In re N.R.W.*, 112 S.W.3d 465, 469–70 (Mo.App.2003), *quoting Z.H. v. G.H.*, 5 S.W.3d 567, 571 (Mo.App.1999).

In *N.R.W.*, both child and mother tested positive for methamphetamine, and the State took custody of the child in October 2001. The father was jailed in December 2001, having never seen the child, although he sent two letters from jail in March 2002. The mother did not try to see or contact her child after October 2001; she was jailed in January 2002 also. The parents offered no support before or after they were jailed. The State petitioned to terminate parental rights in April 2002. Both the trial and appellate courts agreed there was clear, cogent, and convincing proof that the parents abandoned their child:

> Despite the involuntary removal of the child from the custody of Father and

---

given Child a pill, after which Child slept 17 hours, then woke up very ill and refused to eat.

**2.** Parents had surrendered their parental rights on stipulation of the adoption.

**3.** Statutory references are to Missouri Revised Statutes (2000).

Mother, there was clear, cogent, and convincing evidence that establishes a lack of involvement by them which transcends the estrangement and discouragement that resulted from the removal of the child. . . . Between the October 5, 2001, visitation and the parents' incarceration, neither Father nor Mother made an effort to seek contact with the child. Nor did either parent provide for the child during that time. After their incarceration, we acknowledge that the parents' ability to financially provide for the child's care was sharply curtailed. *However, it is more significant to us that a number of months passed before each parent sought contact with the child.*

*N.R.W.*, 112 S.W.3d at 470 (emphasis added).[4]

Parents' disinterest is far more wanton than in *N.R.W.* First, they tried to surrender parental rights to a relative, which "demonstrates a desire contrary to the maintenance of a parental relationship." *P.G.M.*, 149 S.W.3d at 515. After that failed, Parents utterly ignored Child for another one and one-half years, far longer than in *N.R.W.* or required by statute. This is the context in which we consider Parents' four appeal points challenging the § 211.447.4(1) abandonment findings.

Points III (for Mother) and IX (for Father) claim Parents provided gifts and some money; thus, the court's contrary finding was against the weight of the evidence. Parents did bring some small gifts

and snacks when they visited Child in the first eight months, before signing away their parental rights in early 2003. But viewing the record as we must, or in any reasonable manner, there were no gifts after November 2003, which was the time period referenced by the court ("since on or about November 2003").

Points II (Mother) and VIII (Father) challenge the State's proof of Parents' ability to provide financial support. Parents lived together most of the time in question. Both drew disability benefits. Mother claimed her $280 monthly benefit was not always readily available, as she was subject to a guardianship. Father collected $600 monthly, and he earned additional money working odd jobs. Parents argue their income figures alone are insufficient to prove they could support Child financially.

■ We begin by noting Parents never attempted to pay anything for over two years. Even if Parents could not pay for all of Child's needs, they were obligated to contribute what they reasonably could. *In Interest of K.L.*, 972 S.W.2d 456, 461 (Mo. App.1998). Offering support, no matter how minimal, demonstrates a parent's intent to continue the parent-child relationship. *In Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo.App.1996). Even incarcerated parents are expected to contribute minimal support to indicate a willingness to continue in their children's lives. Evidence of such intent, a central consideration in the court's determination, fails if

---

4. Likewise, *In re J.B.D.*, 151 S.W.3d 885 (Mo. App.2004) involved a father who was very involved with his child from birth until the father was jailed five months later. The father then went 14 months without sending the child any cards, letters, or financial support. After he was served a termination petition, and while still in prison, Father constantly sent cards, letters, and tapes on which he would read books to his child, and otherwise strongly evidenced his desire to "get [his child] back" upon his release. *Id.* at 889. The trial court still terminated his parental rights based on his 14–month period of abandonment, and this court affirmed. Father's incarceration did not excuse him from communicating with or financially supporting his child, which are indicators of intent to continue a parent-child relationship. *Id.* at 889–90.

parents fail to make any contribution. *In Interest of B.A.F.*, 783 S.W.2d 932, 934 (Mo.App.1989). A prisoner earning just 33¢ per day still should send something, not to make a real financial difference, but to show the parent still cares. *In re M.L.K.*, 804 S.W.2d 398, 402 (Mo.App. 1991).

We also note Parents made no such claim at trial. To the contrary, both testified they could budget for at least some support, even on their limited current income. The record indicates Parents had discretionary income, at least on occasion.[5] Those were opportunities to send at least token money for Child; buy a postage stamp and send Child a note; or do anything to show Parents' interest in or commitment to Child. They never did so. Points II and VIII wither in the face of Parents' abject failure to offer *any* support to evidence they cared about their child. Poverty is no bar to family love or its expression. Even destitute parents can show their kids that they care.

More importantly, as in *N.R.W.*, Parents' utter and extended forsaking of Child transcends financial issues. Father testified they had a telephone, and had owned three different cars during the time in question. Parents visited Child before signing away their parental rights in early 2003, and a couple of times after the termination petition, so they knew how to do so. But when asked at trial why he went so long without visiting or trying to contact Child, Father replied "I don't have an answer to that question."

Adults may set aside their books, hobbies, or other interests, and ignore them for months without consequence. Not so with their young children. When Child was removed from the family home at age two, he was old enough to know and crave a filial bond. Parents kept that bond alive for eight months, then for reasons unknown, they simply quit. Child was six by trial time, and no longer knew or recognized Parents as his mom and dad—a trial court finding that stands unchallenged on appeal.

The record amply supports the § 211.447.4(1) abandonment finding and rebuts Parents' challenges thereto. We need not consider the other termination grounds. Parents do not contest that termination is in Child's best interest. We affirm the judgment.

PARRISH, J., and RAHMEYER, P.J., concurs.

---

5. For example, Father testified he occasionally drank beer. Presumably he bought at least some of it.