

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| In the Interest of: | ) | |
| M.T.E.H., | ) | |
| | ) | |
| M.E.H., Natural Father, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. SD33637 |
| | ) | |
| GREENE COUNTY JUVENILE OFFICE, | ) | **Filed: June 24, 2015** |
| | ) | |
| Respondent. | ) | |


APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable David Jones, Circuit Judge

**AFFIRMED**

In an October 2014 judgment, the trial court terminated all parental rights in, to, and over M.T.E.H., a seven-year-old child ("Child"), under section 211.447.[1]  Child's father, M.E.H. ("Father"), appeals the portions of the judgment that terminated his rights.[2]  Father's first, third, and fourth points allege, respectively, that it was against the weight of the evidence for the trial court to find that:  (1) Father abandoned Child; (2) Father failed to rectify conditions that were potentially harmful or that caused Child to be taken into care

---

[1] All statutory references are to RSMo Cum. Supp. 2013; all rule references are to Missouri Court Rules (2015).

[2] The judgment also terminated the parental rights of Child's mother ("Mother"), as well as her parental rights over five of Mother's other children, none of whom were sired by Father.  Mother is not a party to this appeal, and we present evidence related to her only to provide context for the evidence relevant to Father's appeal.

such that Child could not be returned to him "in the near future" ("failure to rectify"); and (3) Father's "actions and conditions" demonstrated a negative impact on Child and presented a danger of "future harm" to Child. Father's second point asserts that the trial court erred in finding "that [Child] had been abused and/or neglected by [Father]" based upon Father's mental condition, chemical dependency, and "continued failure by [him] to provide for [Child] with adequate clothing, shelter or education[.]"

Finally, Father claims the trial court abused its discretion in finding that termination was in the best interest of Child as Father had "maintained visitation and contact with [Child] when [it was] allowed by the [trial] court[,]" made "in-kind contributions to [Child,]" and had "shown an increased interest and commitment [to] reunification."

We reject Father's error claims regarding abandonment, the impact of his actions on Child, the risk of future harm to Child, and whether termination was in Child's best interest. As a result, we affirm the portions of the judgment that terminated Father's parental rights.

### Applicable Principles of Review and Governing Law

Sections 211.447.5(1)-(6) and .6 allow the termination of parental rights over a particular child based upon grounds that include: (1) abandonment; (2) abuse or neglect; and (3) failure to rectify. Although a trial court may find that multiple grounds for termination have been met, the affirmation of any one of those challenged grounds on appeal makes it unnecessary to address any additional grounds. *In re K.A.W.*, 220 S.W.3d 310, 318 (Mo. App. S.D. 2007).

> A reviewing court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence or erroneously declares or applies the law. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011). The trial court's judgment will only be reversed if this Court is left with a firm conviction that the judgment is wrong. *Id.*

2

An appellate court reviews conflicting evidence in the light most favorable to the trial court's judgment. *Id.* The reviewing court defers to the factual findings and credibility determinations made by the trial court. *Id.* If the evidence presents two reasonable but different inferences, the reviewing court considers the inference in the light most favorable to the judgment. *Id.*

**In re Q.A.H.**, 426 S.W.3d 7, 12 (Mo. banc 2014).

If the trial court finds that at least one statutory ground supports termination, it must then consider whether termination "is in the best interests of the child. On that question . . . the standard of review on appeal is abuse of discretion." **In re P.L.O.**, 131 S.W.3d 782, 789 (Mo. banc 2004).

### Facts and Procedural Background

The trial of this matter took place over the course of three days in August and September 2014. We summarize the relevant facts in accordance with our obligation to view the evidence in the light most favorable to the judgment, **Q.A.H.**, 426 S.W.3d at 12, and we discuss any facts that are unfavorable to the judgment only to provide context for Father's error claims.[3]

---

[3] We also observe that, in addition to three court summaries admitted for purposes of a best interest determination only, the transcript reveals that at least 13 exhibits related to Child and Father were admitted at trial, including:

17--"MACCS Records" [similarly titled exhibits were described by the deputy juvenile officer as relating to child support records];
21--"Case Docket [number]" concerning Father;
22--"Case Docket [a second number]" concerning Father;
23--"Case Docket [a third number]" concerning Father;
24--"Case Docket [a fourth number] concerning Father;
25--"Case Docket [a fifth number] concerning Father;
46--"Case Docket" with a case number corresponding to the termination proceeding concerning Child;
60--Records for a behavioral health facility concerning Father;
61--Police department records concerning Father;
64--"Psychological Assessment" concerning Father;
70--"Psychological Assessment" concerning Child;
73--"Treatment Plan" concerning Father; and
88--"Case Docket [the fourth number] (Updated)" concerning Father.

An investigations supervisor for the Children's Division ("the Division"), Charlotte Nolan, testified that near the end of November 2012, she "receive[d] a hotline report that involved allegations relating to [Mother] and her children[.]" The reporter claimed that four children were "found on the crossroads of the Kansas Expressway and Kearney, dodging traffic," when "a family friend" picked them up in her car. It had also been reported that the children "had been at different stores stealing items." At the time of these reports, the Division had already received reports about other incidents. One of these incidents involved Child, "who was five at the time, riding his bike alone at night[,] and almost getting hit by a car." Another incident involved an officer responding to the home at 11:30 p.m. in mid-November 2012 and discovering "all of the five oldest children alone in the home[.]"[4]

Ms. Nolan also recalled that Father and Mother were present at a "72-hour meeting" held after Child was taken into protective custody. Father appeared "frustrated" and was "uncooperative." "[H]e indicated that he also knew where [one of the other children being sought for protective custody] was, but he was only concerned about [Child]. Father asked that Child be placed with him, his estranged wife, or "a girlfriend[.]" Ms. Nolan discussed with Father his "history of substance abuse" and that "he was currently on probation for a manufacturing and distribution [sic] within a school zone[.]"

---

None of these exhibits are included in the legal file, nor were they otherwise filed or deposited with this court. Where the record indicates the relevancy of these exhibits, we will presume that their content would be favorable to the judgment and unfavorable to Father. *See **In re C.A.M.**,* 282 S.W.3d 3d 398, 401 (Mo. App. S.D. 2009).

[4] Respondent asserts in its brief that Child was taken into custody on December 10, 2012, and Respondent filed its petition the following day, asserting drug use, criminal history, and a lack of custody rights by Father, in addition to factual averments regarding Mother. Respondent asserts that the trial court found allegations in the amended petition to be true and continued Child in the legal custody of the Division following a hearing in January 2013. In support of these facts, Respondent cites its admitted Exhibit 47, which is listed in the transcript as "Case Docket" with a specific case number and the abbreviation "C/AN[.]" This exhibit was not included in the record on appeal. Father, however, does not dispute this information in a reply brief, and we therefore presume that the exhibit would support these assertions by Respondent. *Cf. **id.***

A foster care case manager, Katie Groce, testified that she began working on the case involving Child and five siblings on December 10, 2012. She recalled that "there [was] some discussion [with Father at the 72-hour meeting] as to [the] things he would need to do in order to be considered" as the custodian for Child. Ms. Groce prepared a treatment plan for Father.

A psychological evaluation of Father was performed in January 2013 by Dr. Mark Bradford. Dr. Bradford opined that:

> [Father] suffered from chronic anxiety, generalized anxiety, and cannabis dependence and antisocial personality disorders. He'd been using marijuana for many, many years and was still using at the time I saw him. So at the time I saw him . . . he did have a chemical dependence. Since that time, I have no knowledge.

In Dr. Bradford's opinion, Father's drug dependence stemmed "from his teen years. [Father] had a lot of anger, and his way of dealing with his anger was to use pot probably." In addition to anger, Dr. Bradford opined that Father had "[a] lot of anxiety . . . and he basically soothed his nerves by lots of cannabis." Dr. Bradford did not believe that Father's chemical dependence would change "without treatment[.]"

Father had weekly, supervised visits with Child, most of which were supervised by Ms. Groce, and those visits were increased from one to two hours in February 2013. Father brought "clothes and different things, a snack, things like that" for Child when he came to the visits. While Father interacted appropriately with Child "[f]or the most part," there appeared to be some kind of "an issue" with Father on one occasion, and Father would not explain to Ms. Groce "what was going on. And then the second time that [they] had issues, he just denied being upset or angry during the visit."

Ms. Groce had "not been able to do home visits in [Father's] home since February . . . 2013, due to safety concerns from [her] agency." Father "started to become more verbally aggressive in FST [family support team] meetings, and [Ms. Groce] believe[d] there were a couple of police reports where [Father] was listed as a suspect for some domestic assaults and those type . . . of things[.]"

A licensed professional counselor, Chelsea Fowler, testified that she began every-other-week sessions with Child in spring 2013. Child was not well adjusted initially, and the counselor was working with Child "on manners, his respect and some mild anger management issues." Child's progress in these areas "cycle[d]." Ms. Fowler explained that "whenever [Child] gets a piece of really difficult news about something happening with [Mother or Father], then he has a spike in reactive behaviors and loss. And he just--He has a lot of unresolved grief." Child expressed to Ms. Fowler that he wanted to remain with his brothers, and she opined that removing Child from his siblings would have "a very negative impact [on him]."

> Concerning Child's description of his relationship with Father, Ms. Fowler testified:
>
> Probably every session, he asks, "Will I see my dad?" Why or why not?
> "Will he come see me? Will he write me?" And he's also able to express
> that--We talk about in session that he has a volcano, and that's his anger, and
> that's the visual that we utilized. And he has said that his dad has a really,
> really big volcano.

By the date of trial, Ms. Fowler thought that Child had progressed to the point of being well adjusted. She recommended the termination of Father's parental rights, which she believed to be in Child's best interest.

In April 2013, the trial court suspended Father's visits with Child. The order doing so provided that Father would be allowed to resume visits with Child if Father had "a hair

6

test," "a clean U/A[,]" and also completed anger management training.[5] Ms. Groce did not recall the specific reason that caused the suspension of the visits, but she thought that Father knew "what he needed to do in order for visits to start up again[.]"

In May 2013, Father completed an anger management program, but the family support team asked Father to complete another such program because the first one "had not appeared to help him." According to Ms. Groce, Father completed a hair test, and "[h]e was able to provide a clean U/A later in September" 2013. Ms. Groce recalled that Father also sent one letter to Child in September 2013.

Dr. Bradford performed a psychological evaluation of Child in August 2013, and the report of that assessment was received into evidence. Dr. Bradford opined that Child had "a mild adjustment disorder who [sic] needed to be taught right from wrong and be pointed in the right direction." In order to address Child's needs, Dr. Bradford recommended "a safe, stable home, no chaos, but a good law-abiding, stable home which recommends good school, respect for authority, do your homework, be a good citizen, stay away . . . from drugs, stay away from bad behavior and that sort of thing."

A therapist, Aaron McGuire, testified that except for one week, he had weekly sessions with Father for about two months beginning in September 2013. The purpose of that therapy was to work on Father's "anger control[,]" anxiety, and "frustration with the current situation" with a goal of reunification with Child. Mr. McGuire opined that while Father understood "the obstacles that were keeping him from having placement of [Child,]" Father also blamed "the system" for the situation.

---

[5] Based upon testimony from Ms. Groce and Dr. Bradford, the trial court could reasonably have concluded that "a clean U/A" meant a urine analysis that was negative for controlled substances.

Mr. McGuire stated that Father appeared willing to make changes and was "trying to use better self-control[,]" but after his November 18, 2013 session with Father, Father "just never showed back up," even though another session had been scheduled and Father had not been released from therapy. Mr. McGuire or his office "never heard from [Father]" again. At the time Father discontinued therapy, Mr. McGuire "very much" thought that Father "still had a need or a use for therapy[,]" and he described Father's progress in therapy at the time he stopped coming as "minimal[.]"

After November 2013, Father's contact with Ms. Groce became "very sporadic, if it ha[d] occurred at all." As a result, she was unable to ask Father to take random drug tests. Ms. Groce continued to send Father letters asking him to contact her, and she provided him with "upcoming dates" relevant to Father's case. During the course of the case, some of the mail sent to Father at the address he had reported as current was returned, unopened, from that address. Father also did not answer or return telephone calls from Ms. Groce.

Father failed to keep Ms. Groce informed of "new pending legal issues" after November 2013, but she learned that "additional legal issues" had arisen based upon "docket sheets through Case.net or arrests with mugshots, [or] pictures of mugshots." Father did not make Ms. Groce aware that he was attending "any other individual counseling" after he stopped seeing Mr. McGuire. Ms. Groce was aware that Father had completed another anger management program in December 2013.

Ms. Groce testified that visitation between Father and Child did not resume after April 2013, and Father did not ask her for any visits with Child.

In February 2014, Child had a visit with Mother, "and an associate of [Father's] brought gifts to the visit . . . . that . . . were partially from [Father], as well as other members

8

of that family." Those gifts, and items provided during Father's previous visits, were the only support Father had a hand in providing for Child.

In April 2014, Ms. Groce visited Father in jail. They discussed that Father could come to her office later for a meeting, presumably after his release, and Father made a statement indicating that he knew "the type of vehicle that [Ms. Groce] drove." Ms. Groce had been careful "not to drive [her vehicle] around [Father], due to safety concerns[.]" Ms. Groce did not feel that her agency could provide any other services to Father "that would enable reunification between [Father] and [Child] in the near future[,]" and she recommended that Father's parental rights be terminated.

A probation and parole officer, Dedra Roark, testified that she began supervising Father in April 2014 and met with him regularly. Ms. Roark believed that Father had violated his probation during her period of supervision by using marijuana, and she said that Father had tested positive for using marijuana on "[a] lot" of occasions. A proceeding seeking the revocation of Father's probation was ongoing. Father had been referred to a drug treatment program, but he was discharged from that program a month before trial due to his unsuccessful performance. Father had also undergone "a few" substance abuse evaluations. If Father had attended any other substance abuse program, Ms. Roark was unaware of it, and Father had not reported "attending NA or AA meetings[.]" In Ms. Roark's view, Father was "unsuccessful" on probation.

At the start of the first day of trial, Father was not personally present, and he did not appear by counsel. Later that day, while Dr. Bradford -- the tenth witness called by Respondent -- was testifying, Father entered the courtroom. At that point, Dr. Bradford's written psychological evaluation of Father had already been received into evidence. When

9

Father entered the courtroom, Respondent's counsel stopped her direct examination of Dr. Bradford and advised the trial court of Father's arrival.

Father's explanation for not having appeared on time for the trial was that he "wasn't going to come." Father informed the trial court that he did not have an attorney, and the trial court explained to Father that no appointment of counsel for Father had been made because Father had made a bond for $100,000 and had "paid for [Mother's] attorney[.]" When the trial court asked Father if he "want[ed] time to go out and hire" a lawyer, Father questioned whether that would make a "difference[,]" and he stated that he was not "going to keep wasting money." Despite that statement, Father also indicated that he could possibly hire an attorney in "[a]bout a month or so." The trial court declined to delay the trial that long.[6]

At one point during this exchange, Father's ability to consent to a voluntary termination of his parental rights was discussed, and Father stated, "I ain't signing my rights over to no--anybody. If it was going to my family, yeah, I'd sign them over now. We don't even have to go to court." Father additionally stated that there was "no sense" in "signing [his] rights over" and added, "You all going [sic] to have to take [Child]. I'm not signing them over to somebody that ain't his parents."

Dr. Bradford eventually resumed testifying. When he began to talk about Mother's projection of "blame on the men in her life," Father interjected, "Hey--[.]" The trial court directed Dr. Bradford to stop his testimony "for a moment[,]" and Father stated, "That's just more better for our kids, right? Fuck that." The trial court then noted for the record "that [Father] has departed the courtroom."

---

[6] Father's appeal does not include any claim that the trial court abused its discretion by continuing to proceed with the trial.

When the trial resumed a week later, Father was not present, and an attorney did not appear on his behalf. At the end of the presentation of evidence that day, Mother informed the trial court that Father was "in custody." When the trial resumed for its final day about three weeks later, Father appeared from jail, and he was also accompanied by appointed counsel.

The trial court indicated that Child's counselor could be recalled if Father wished, and Father's counsel stated that he did not "see any reason to have . . . . that witness back on the stand." Respondent did recall Ms. Groce as a witness, and she testified that Father had telephoned her after she had initially testified at trial. He asked about "what services he could do to work towards getting [Child] returned to him." Near the end of their conversation, Father asked "what would happen if his rights were terminated[.]" Ms. Groce testified: "I explained to him what that would mean, and at that time he stated that we would be taking life from him, and if we did that, that he would 'take life from one of you,' were his statements, 'life for life.'" She regarded this as a threat and reported it to the police.

Father testified during the last day of trial, and he admitted "that there was an issue with [him] not being willing to visit [Child.]" Father said he missed visits and he knew that this could be regarded as appearing contrary to his professed love for Child, but he indicated that it was hard for him to see Child and then have to walk out without him. Father regarded Child as his "twin" and testified that Child was "exactly like" him.

Father admitted that he did not finish a parenting class "[b]ecause then [he] kind of lost faith that [he] wasn't going to get [Child] back." Father also admitted that he continues to use marijuana even though he knows that it is in violation of his terms of probation, and he stated that he was "going through courts now for that." Father explained that he "use[d]

11

marijuana to cope with [his] anger and [his] bitterness of [sic] a lot of things," and he reasoned that using marijuana was "better than going off and smoking meth, crack and other things like that, or drinking." Father agreed that he had not completed the treatment program "the way the team wanted [him] to do it[,]" and he said that this was because of his anger or bitterness over Child "being taken." Additionally, Father said that he didn't "know how to communicate with" "a certain caseworker," and he "didn't want to hear anything about her."

Father testified that he had "ADHD." He also stated that he was "[b]ipolar," but he was not treating either of these conditions by seeing anyone or taking any prescription medication. He saw "no need" to see a psychiatrist because he was not getting into trouble, but he thought he would receive medicine for his mental health issues in prison. Father said he could not work because he had "a lot of anger issues" and was "very hyper." He maintained that he had been receiving benefits on account of his disability since he was "eight years old[,]" and he stated that his "disability check" was $735 to $740 per month. Father said that he was paying for his lawyer in his criminal case from his disability payments, and he also had "a support team behind [him]."

After all of the witnesses had testified, the guardian ad litem recommended that Father's parental rights be terminated.

In its judgment terminating Father's parental rights, the trial court found, in addition to findings concerning neglect and failure to rectify, that:

> [C]hild has been abandoned by [Father]. The evidence presented established that [Child] was older than one year at the time of hearing, and that [Father] had not visited or otherwise contacted [Child] since April 2013, approximately 16 months previous. At that time [Father's] visits were suspended due to failure to get into drug treatment and his angry outbursts. He was not prevented from sending cards or letters to [Child] and the visits

12

were to be restarted if he were to engage in substance abuse treatment and complete an anger management course. [Father] did not complete treatment and has continued to use marijuana by his own admission. [Father] started anger management classes, but did not complete them. [Father's] own testimony was that he was angry and didn't like supervised visitation so he stopped going and gave up. It was [Father's] choice to stop having contact with [Child]. Since the visits were suspended [Father] has provided a present or two, but has not, in any way, provided for [Child's] needs and the only thing preventing him from seeing and caring for [Child] has been his own choices.

In connection with its finding that Father had neglected Child, the trial court also stated:

As previously described [Father] has chosen his anger and marijuana over contact with [Child]. When the case first began [Father] routinely provided gifts, clothing and other in-kind items for [Child] and some of the other boys. However, after a few months [Father] stopped going to visits, stopped going to treatment, stopped seeing his counselor and stopped having any communication with [Child]. [Child's] counselor described how much [Child] misses [Father] and how much he wants contact from him. [Father] testified how much [Child] means to him but his actions do not reflect this. In what has most likely been the hardest year in [Child's] life, [Father] has failed to address any of [Child's] needs. He has not provided for [Child financially], emotionally, medically or developmentally. There was no evidence that there was anything preventing [Father] from providing for [Child] other than his choices not to participate in the case and to continue to engage in criminal behavior that was likely to lead to incarceration.

In considering "the acts and conditions" that supported a termination of the parental rights of Father and Mother, the trial court also found that the "negative impact on [Child]" due to "[F]ather's abandonment of [Child], . . . [Father's and Mother's] continued drug use, [Father's and Mother's] continued involvement in criminal behavior, [Father's and Mother's] neglect of [Child], and [Father's and Mother's] failure to make changes in [their] lifestyle present an ongoing danger to the welfare of [Child]." Further, "[C]hild is significantly likely to suffer future harm if parental rights are not terminated because of [F]ather's abandonment,

13

[Father's and Mother's] continuing neglect, drug use and [Father's and Mother's] failure to demonstrate an ability to provide [Child] with appropriate parenting."

The trial court also found that termination would be in Child's best interest, discussing seven factors set forth under section 211.447.7. Some of those findings will be detailed in our analysis of Point 5. The judgment ordered the termination of Father's parental rights in, to and over Child. This appeal by Father timely followed the entry of that judgment.

**Analysis**

*Point 1 – Abandonment*

Father's first point claims the trial court's finding that Father had abandoned Child was against the weight of the evidence, in that

1. Enough evidence was presented that [Father] was making attempts to see [Child].

2. That [Father's] issues with drugs did not interfere with his ability to parent [Child] or to attend visitation.

3. That he was able to control his angry outbursts while in the presence of [Child].

4. That [F]ather had attended drug treatment and anger management classes immediately preceding the initiation of this matter.

5. That [Father's] only drug of choice is marijuana and it did not interfere with the visitation with [Child] or the caring thereof.[7]

---

[7] Father's point is defective. It only indirectly hints at legal reasons that might support its claim of reversible error, and it fails to "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error" as required by Rule 84.04(d)(1)(C). Most importantly, Point 1 provides no context explaining how the evidence supporting the judgment was so deficient in probative value when it is considered in the context of all the evidence that it is unbelievable concerning the findings as to abandonment. *See* **Houston v. Crider**, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010) (discussing elements of an against-the-weight-of-the-evidence challenge). Although we choose to review the point *ex gratia*, insofar as we discern Father's argument, *cf.* **In re E.A.C.**, 253 S.W.3d 594, 600 (Mo. App. S.D. 2008) (multifarious point in violation of Rule 84.04(d) reviewed gratuitously "due to the gravity of the termination of parental rights)), this flaw in the point carries into the argument that follows it. As discussed, *infra*, there is no demonstration of why the

14

"[A]n against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment[.]" *Houston*, 317 S.W.3d at 186.  Additionally, we still "defer to the trial court's credibility determinations" in assessing such a challenge.  *Id.*  A challenger must still "identify all of the favorable evidence in the record supporting the existence of that proposition [necessary to the judgment]" and in presenting contrary evidence, he must still resolve conflicts in testimony according to the trial court's explicit or implicit credibility determinations.  *Id.* at 187.  The challenger must then "demonstrate why the favorable evidence, along with the inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition."  *Id.*

Section 211.447.5(1) provides that a ground for termination exists when

The child has been abandoned.  For purposes of this subdivision a **"child"** means any child over one year of age at the time of filing of the petition.  The court shall find that the child has been abandoned if, for a period of six months or longer:

    (a) The parent has left the child under such circumstances that the identity of the child was unknown and could not be ascertained, despite diligent searching, and the parent has not come forward to claim the child; or

    (b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]

As explained in *In re Interest of V.C.N.C.*, 458 S.W.3d 443, 448 (Mo. App. E.D. 2015) (internal quotations omitted):

Abandonment can be defined as "a willful delivery of the child with intention that the severance be permanent [or] a voluntary and intentional

---

evidence supporting the judgment is so lacking in probative value when viewed in the light of all of the evidence that it simply cannot be believed.

15

relinquishment of the custody of the child to another with the intent to never again claim the rights of parent or perform the duties of a parent." [*C.M.B.R.*, 332 S.W.3d at 816]. The question is largely the intent of the parents, and can be proven by showing the parents, without just cause or excuse, "intentionally withheld [their] presence, care, love, protection, maintenance and the opportunity for display of filial affection from the child." [*Id.*] Generally, it is difficult to find abandonment when custody has ended involuntarily. [*Id.*] However, the court may still find abandonment when "a parent's lack of involvement goes beyond what is attributable to the estrangement and discouragement caused by the enforced separation." [*Id.*]

"Only the parent's conduct prior to the filing of the petition for termination may be considered to establish the six-month period." ***In re J.B.D.***, 151 S.W.3d 885, 888 (Mo. App. S.D. 2004). But actions occurring both before and after the six-month statutory period may be considered in determining a parent's intent. ***R.P.C. v. Wright Cnty. Juv. Office***, 220 S.W.3d 390, 392 (Mo. App. S.D. 2007).

Father begins his against-the-weight-of-the-evidence argument by conceding that Respondent "did establish that [Child] was over one year in age and that no visitation had occurred for approximately 16 months."[8] Father further acknowledges that the trial court's suspension of visitation in April 2013 "did not prevent [F]ather from sending cards or letters," and Father states that "[n]o evidence was presented to suggest that [F]ather had sent cards or letters while his visits were suspended." Finally, Father admits that he continued using marijuana even though he "understood that it was a violation of his parole."

Father's argument then proffers an explanation for the termination of his visits, claiming that "there [is] little to scant evidence in the record that justified the suspension of

---

[8] That sixteen-month time period included a six-month period of time between April 2013 (when visits ceased) and the day the petition was filed in December 2013, during which no contact occurred between Father and Child, with the possible exception of a letter Father may have sent Child in September 2013. The trial court found that Father had not "otherwise contacted [Child] since April 2013[.]" Even if we assume that the trial court believed Father sent one letter to Child in September 2013, it could properly have considered that contact as merely token. *See In re J.W.*, 11 S.W.3d 699, 704 (Mo. App. W.D. 1999) (for purposes of abandonment, "[a] court may disregard contacts that it finds to be 'token or nominal'") (quoting *Z.H. v. G.H.*, 5 S.W.3d 567, 570 (Mo. App. W.D. 1999)). Section 211.447.8 also provides that "[t]he court may attach little or no weight to infrequent visitations, communications, or contributions."

16

visitation, [and] there is indication that the [family support] team sought to dishearten Father by stating that he was not a reunification option from the beginning." Respondent counters that while Father "may have had real struggles that are ongoing . . . that does not change the fact that he abandoned [Child] by failing to contact him and by failing to provide support for a period of time in excess of 6 months."

We agree with Respondent. First, Father has not challenged the propriety of the trial court's suspension of visits he now argues was based on "scant" evidence. Further, given the fact that the order suspending visits specifically stated the things Father needed to do in order to resume his visitation with Child, the critical facts are whether Father attempted to meet those conditions and then pursued continuing contact with Child.

Even if the suspension of visits and the Division's earlier refusal to recommend placement with Father are regarded as factors that could discourage a parent from communicating with and supporting a child, Father was also referred to many services that, if Father had taken advantage of them, would have encouraged Father to persist in efforts to support and reunite with Child. Father's increase in visitation time early on permitted him an opportunity to strengthen his relationship with Child, and individual counseling with Mr. McGuire was intended to help Father deal with his frustration over Child's removal so as to help Father reunite with Child.

Most importantly, Father testified that he intentionally chose not to visit Child because it was hard for him to see Child and then have to walk out without him. Father has not demonstrated why the trial court could not find, based on this admission and all of the other evidence, that even though Father had completed the steps that would have enabled him to resume his visitation with Child, Father did not visit Child simply because he was

17

"unwilling" to do so. His claim that "[e]nough evidence was presented that [he] was making attempts to see [Child]" does nothing to call into question the probity of the evidence demonstrating that, apart from one token letter, Father stopped communicating with Child for at least six months "without good cause[.]" *See* section 211.447.5(1)(b).

We also find it significant that Father fails to address the evidence that he did not support Child. None of Father's subpoints or arguments contend that there was evidence that he had made provision for parental support of Child. The provision of even minimal support may demonstrate that a parent does not intend to abandon his child but intends instead "to continue the parent-child relationship." *R.P.C.*, 220 S.W.3d at 393. Father's own testimony revealed that he received monthly disability payments and had "a support team behind [him]." Despite the availability of these resources, Ms. Groce testified that Father provided nothing in terms of support after April 2013, apart from gifts "partially from [Father]" supplied on one occasion in February 2014 -- an action that took place after the termination petition was filed and is not cited by Father in argument supporting Point 1 as evidence of his intent to support Child. As earlier noted, the trial court may "attach little or no weight to infrequent . . . contributions[,]" section 211.447.8, and "[i]t is well-settled . . . that a parent's post-filing conduct is often given little weight in determining repentance" of abandonment. *In re E.F.B.D.*, 245 S.W.3d 316, 326 n.10 (Mo. App. S.D. 2008). Father's argument does nothing to challenge the trial court's finding that, apart from a "a present or two," Father "has not, in any way, provided for [Child's] needs[,] and the only thing preventing him from seeing and caring for [Child] has been his own choices." Point 1 fails.[9]

---

[9] Because the trial court's finding that Father had abandoned Child was not against the weight of the evidence, points 2 and 3 are moot, and we need not address them. *See K.A.W.*, 220 S.W.3d at 318.

18

*Point 4 – Impact of Father's Actions on Child*

Father's fourth point contends that it was error for the trial court to find, "as a ground to terminate Father's parental rights, that the acts and conditions of [Father] supported termination of parental rights[.]"  It then lists three specific reasons:

1. There was enough evidence that [Father's] actions did not constitute abandonment and did not have a negative impact on [Child].  That there was not enough evidence to find that the mother [sic] had continued to neglect [Child].

2. There was not enough evidence to establish that [F]ather's actions constituted abuse and neglect.

3. There is not enough evidence to establish that [Child] would suffer future harm if [Father's] parental rights were not terminated.[10]

The judgment's consideration of "the acts and conditions of the parent supporting termination of parental rights" followed its analysis of the specific grounds for termination (abandonment, neglect, and failure to rectify).  This subsequent consideration of whether those grounds had a negative impact on Child, were severe enough to be abuse or neglect, and indicated a risk of future harm does not, of itself, constitute another, distinct statutory ground for termination.  While the judgment does not explicitly cite **K.A.W.**, this portion of the judgment appears to track a portion of that opinion, which states:

> The trial court relied upon several specific acts and conditions of [the m]other in support of the grounds for termination.  Each one must be supported by clear, cogent and convincing evidence and will be analyzed for: whether there was sufficient reason to believe that it had an impact upon the [children], whether it was severe enough to constitute abuse or neglect and whether it provides an indication of the likelihood of future harm to the [children].

---

[10] Point 4 is defective for the same reason as Point 1 and it further fails to specify whether its evidentiary challenge is that there is not substantial evidence supporting the judgment or it is against the weight of the evidence.  These are separate challenges that should be asserted in separate points.  *See In re Estate of L.G.T.*, 442 S.W.3d 96, 109 n.13 (Mo. App. S.D. 2014).  But, given the gravity of termination of parental rights, we will again review the point *ex gratia* as best we discern it.  *Cf.* **E.A.C.**, 253 S.W.3d at 600.

19

133 S.W.3d at 12.

In any event, Point 4 and its supporting argument suffer from the same flaw we noted in Father's first point -- it does not address all of the evidence supporting the trial court's finding that Father's abandonment had a negative impact on Child. Father's argument does nothing to detract from the trial court's finding -- originally made within the context of its neglect finding -- that Father stopped contacting Child, and "[C]hild's counselor described how much [Child] misses [Father] and how much he wants contact from him." Ms. Fowler testified that Child continually asked about when he would see Father or hear from Father, and Child would question why he would not see or hear from Father. She also testified about the reactionary "spike" in Child's behaviors when something had happened concerning his parents. The trial court's finding that Father's abandonment had a negative impact on Child and that he neglected Child was not against the weight of the evidence.

Father also incorporates his argument supporting his second point concerning neglect, but that argument did nothing to undermine the probative value of the evidence that he had failed to support Child although he was able to do so. See 211.447(5)(2)(d). Instead, he argues that he had not been ordered by a court to provide for Child's needs and that if he had had other visits, it could be assumed that he would have provided additional in-kind assistance. Of course, the absence of a court order "does not relieve Father of his duty to support his child." *In re M.J.H.*, 398 S.W.3d 550, 561 (Mo. App. S.D. 2013). And, as previously discussed, Father intentionally chose not to attend visits, so it can hardly be assumed that he would have chosen to provide additional in-kind visitation, and he does not even address his ability to provide at least minimal financial support given that he received monthly benefits and had his own support team. It was not against the weight of the

20

evidence for the trial court to find, in the context of addressing additional considerations, that Father's failure to support Child was severe enough to constitute neglect.

Concerning the direction in *K.A.W.* that "[t]here must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm[,]" 133 S.W.3d at 10, Father acknowledges the trial court's finding of such a risk. He then simply incorporates his "[a]rguments 1 and 2" addressing "the issues of abandonment, continued neglect, drug use and failure to demonstrate ability to appropriately parent" in support of his contention. We are unable to find any such argument in any portion of Father's brief.

We need not address an issue that is raised in a point but abandoned in argument. *See In re S.M.B., Jr.*, 254 S.W.3d 214, 219 n.5 (Mo. App. S.D. 2008) (a best-interest determination that was challenged in a point, but not developed in the supporting argument was not reviewed). Point 4 fails.

*Point 5 – Best Interest Determination*

Father's fifth point contends the trial court abused its discretion in finding that it was in Child's best interest to terminate Father's parental rights based on his claims that he: (1) "maintained visitation and contact . . . when [it was] allowed by the [trial] court"; (2) "ma[d]e in-kind contributions to [Child]"; and (3) has "shown an increased interest and commitment [to] reunification."

"[A] finding that termination is in the child's best interest is a subjective assessment based on the totality of the circumstances." *C.A.M.*, 282 S.W.3d at 409. The trial court's discretion to make this determination "is abused when [the] court's ruling is clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *In re A.S.*, 38

21

S.W.3d 478, 486 (Mo. App. S.D. 2001). Father does not assess the totality of the evidence and then demonstrate that the trial court's finding was shocking or was made without careful consideration. *Cf. In re A.Y.M.*, 154 S.W.3d 412, 417 (Mo. App. S.D. 2004) (parent's best interest contention rejected where it failed to claim that "the [trial] court's ultimate best interests conclusion was unproven by the *totality of the evidence* presented" and there was a preponderance of evidence supporting the best interest finding).

We will not repeat here the evidence concerning Father's failure to ask for renewed visits, his token letter, and his discontinuance of even in-kind support for Child after the petition was filed. The trial court was not required to credit Father's claimed increased interest or commitment to reunification, nor was it required to subscribe to Father's speculation in his brief that "he would have been more committed to the treatment plan and regaining visits" if he had not been told by the family support team that he was not being considered as a placement for Child.[11] *See In re D.M.B.*, 178 S.W.3d 683, 687 (Mo. App. S.D. 2005) (the trial court "was free to believe or disbelieve all, part or none of the witnesses' testimony"). To the contrary, our review for an abuse of discretion requires us to defer to the trial court's factual findings and credibility determinations. *Q.A.H.*, 426 S.W.3d at 12. We will not reweigh the evidence or speculate as to conclusions that could have been drawn from evidence presented that was not favorable to the judgment.

Moreover, Father's point fails to challenge two of the trial court's other findings supporting its best-interest determination. The trial court found that Child's emotional ties to Father caused Child to worry when he did not see Father, and it found that Child

---

[11] Father does not cite the record for this alleged evidence. It may be a reference to his own testimony that even though he was told about what could be done to possibly permit him to have custody, he "was already ruled out because of [his] background." He went on to testify that his "background" meant "drug case[s]" in two cities.

22

"experience[d] anxiety and extreme frustration that his parents are not willing to change." Nothing in the record suggests that to continue Child in such a state would serve Child's best interest.

Further, Father's fifth point did not address the trial court's finding that "[a]dditional services would not be likely to bring about a lasting parental adjustment" given that Father "has previously refused to complete or begin" other services. Father's argument does summarize this finding, but it then simply incorporates his other argument in support of Point 3 on this topic. "Arguments raised for the first time in the argument portion of a brief and not raised in the points relied on are not preserved for review and are considered abandoned." *In re Adoption of C.M.*, 414 S.W.3d 622, 668 n.81 (Mo. App. S.D. 2013). Moreover, Father's Point 3 argument does not aid him; he conceded there that "there [wa]s ample evidence that [F]ather did not finish all the programs [to which] he was referred," and Father's assertion that "there is no evidence . . . that the team's issues with [F]ather were affecting his ability to parent" flies in the face of Father's own trial testimony.

Father testified that he did not complete treatment because he was angry or bitter. And he stated that he did not "know how to communicate with" a particular caseworker and he "didn't want to hear anything about her"--not that a caseworker or "the team" had an issue with providing services to him. The trial court could reasonably find from this evidence that additional resources were unlikely to bring about a lasting adjustment in Father.

Indeed, Father's actions at trial in appearing late, interrupting the proceedings with inappropriate remarks, and abruptly leaving the courtroom provided the most current evidence of Father's problems with assimilating services, controlling his behavior, and putting his commitment to Child above his own desires. As Respondent persuasively

argues, Father's testimony focused on his own needs instead of Child's needs. This provided additional support for the trial court's conclusion that terminating Father's parental rights would serve Child's best interest. Point 5 is also denied, and the judgment is affirmed insofar as it relates to the termination of Father's parental rights in, to, and over Child.

DON E. BURRELL, J. - OPINION AUTHOR

MARY W. SHEFFIELD, P.J. - CONCURS

NANCY STEFFEN RAHMEYER, J. - CONCURS