Anthony Rex Gabbert, Judge
R.O., Father, appeals the circuit court's judgment finding Father neglected his two-year-old daughter,[1] Child, by exposing Child to domestic violence and failing to protect Child's four-year-old half-sibling (Sibling) from physical abuse perpetrated by Child's mother. Father asserts three points of court error. First, he contends the circuit court erred in sustaining Count 2 of the Juvenile Officer's petition alleging Child was in need of care and subject to the court's jurisdiction because it refused to consider evidence that Child was not in need of care and treatment at the time of the adjudication hearing. Second, he contends there was insufficient evidence to prove Father abused or neglected Child. Third, he contends the circuit court erred in finding reasonable efforts were made to prevent Child's removal from Father's custody because the court's order lacks specificity and fails to outline its reasoning to support change of custody. We affirm.
Factual and Procedural Background
The evidence, in the light most favorable to the circuit court's judgment, was that Sibling was born to Father and D.R. on February 16, 2013. When the Juvenile Officer's petition was filed in 2017, Father and D.R. shared joint custody of Sibling; Father had parenting time with Sibling in his home every other weekend. Father resided with his girlfriend, Child's Mother. Child was born to Father and Child's Mother on April 13, 2015. Father, Child's Mother, and Child were all present at various times when Sibling visited their home.
In March 2017, pediatric nurse practitioner, Amanda Divine,[2] examined Sibling for his four-year check-up. During that examination Divine observed scars on Sibling's penis and left ear. Sibling told Divine that Child's Mother, "cut my pee-pee with tweezers. I don't know why her did it. I was sleeping." He also told Divine that Child's mother, "fired me with her lighter. I hid under my [blanket]," "Her makes mad faces at me," and "Her throwed me and I splitted my ear." Because Divine suspected child abuse due to the scars and Sibling's statements, she reported the matter for further investigation.
Dr. Emily Killough,[3] a child abuse pediatrician at Children's Mercy Hospital, examined Sibling on March 29, 2017. Killough testified that Sibling had previously been seen in Children's Mercy's Safety, Care & Neglect unit (SCAN Clinic) in March 2014 for bruising and abrasions after returning from Father's care. He was one year old. In October/November of that *612 same year (age one and a half) Sibling was seen at the SCAN Clinic for an oblique fracture of the right proximal tibia (shin bone), and a buckle fracture of the base of the first metatarsal on the right foot. Symptoms related to the injuries began while Sibling was in Father's care. Sibling was placed into foster care at that time for suspected child abuse by an unknown perpetrator. The record is unclear as to when Sibling was returned to parental custody.
In October/November 2016 (age two and a half), Sibling was seen at the SCAN Clinic for bruising and abrasions on his face, neck, and buttocks. Sibling reported being slapped and spanked by Child's Mother. Sibling was diagnosed with physical abuse.
Sibling was seen in the emergency room at Children's Mercy Hospital in January 2017 for an ear injury requiring eleven stitches. Sibling was in the care of Child's Mother when the injury occurred. At that time, Sibling stated that the injury was the result of falling off a scooter and hitting his ear on a table.
Dr. Killough testified that, during her examination of Sibling she observed the scar on his ear and asked him what happened. He responded, "[Child's Mother] threw me and broke my ear." Killough testified that the nature of Sibling's ear injury was highly indicative of child abuse. Killough also observed the scar on Sibling's penis. Sibling told her, "[Child's mother] hurt me with tweezers," and made a pinching motion with his finger and thumb. Killough testified that the injury Sibling sustained was consistent with his description of the cause. When asked on cross-examination if the prior history of Sibling's multiple injuries influenced her diagnosis regarding Sibling's present injuries, Killough testified, "It definitely I think is more influence on my sort of ongoing safety concerns." When asked if Killough had any information that Father was aware of the injury to Sibling's penis, she testified she did not know, but would assume a three-year-old would have needed help going to the bathroom, wiping, bathing or showering.
Kristin Kunard, a forensic interviewer with The Child Protection Center, testified as to interviews conducted with Sibling in April 2017.[4] Sibling reported to Kunard that Child's Mother "cut his pee-pee with tweezers," "threw him on the floor and broke his ear," and "burned him with a lighter." Sibling reported that Child's Mother put him outside and put tape on his mouth. Sibling told Kunard regarding the tweezer incident, "My daddy just comed [sic]," "Like, daddy just talked to [Child's Mother]." With regard to the lighter incident, Sibling told Kunard that Father was in another car. Sibling expressed to Kunard that he witnessed Child's Mother throw a frying pan at Father, breaking Father's nose. When asked if Sibling had anyone he could confide in if someone hurt him, he said he could talk to "mommy."
Sibling's biological mother, D.R., testified at trial.[5] D.R. testified that in 2016, Sibling told her he was watching a cartoon and Child's Mother smacked him across the face leaving a hand-sized bruise. D.R. took Sibling to Children's Mercy and also asked Father about the incident. Father told D.R. that Child's Mother was in the bathroom doing her makeup. Father could see everything in the small duplex apartment and Child's Mother had not hit Sibling across the face. D.R. testified she *613 believed Father may not have seen the incident, but also believed Father was "covering for [Child's Mother] because he's scared to death of her[.]" D.R. testified that every weekend Sibling was at Father's home, Sibling would come home with a different injury. Once he had a bald spot shaved in the back of his head down to his scalp; Father and Child's Mother had no explanation. Sibling would regularly be returned to D.R. with "random" bruises in atypical areas, such as on the back of his legs and bottom.
D.R. testified that Sibling told her about witnessing Child's Mother throw a pan at Father's face, breaking his nose and giving him two black eyes. Sibling told D.R. he was scared of Child's Mother. He told D.R. that Father and Child's Mother fought a lot and that Sibling would hide under the kitchen table. Sibling told D.R. that Sibling's sister was scared as well. D.R. testified that she did not believe the children in Father's home were protected as D.R. would get calls every time Sibling was there and D.R. could hear screaming and fighting in the background.
D.R. testified that in late December or early January 2017, she noticed a cut on Sibling's penis while bathing Sibling. Sibling told D.R. Child's Mother cut him with tweezers. D.R. immediately called Father and asked if he knew anything about this. D.R. put Father on speakerphone and had Sibling talk to him. Father said Sibling had come into his room crying one night, but Father did not know why. D.R. testified she did not contact Children's Services immediately to report the incident because Sibling had previously been placed in foster care and she was scared he could return; D.R. wanted to discuss the situation with Father first in the event it was an accident. D.R. testified that she had made numerous hotlines against Father and Child's Mother in the past. D.R. was told by Children's Services that she and Father needed to talk over issues of concern. D.R. previously attempted to restrict father's custody when she had prior concerns of abuse but "lost the case." D.R. took Sibling to the doctor the day after observing the penis injury, however.
D.R. testified that in early February 2017, Child's Mother called D.R. at work and told her Sibling had been injured and there was blood everywhere. D.R. left work immediately and took Sibling to the hospital. His ear required eleven stitches. Father and Child's Mother were also present at the hospital. Sibling told hospital staff he was riding his scooter and fell. Approximately one week later, Sibling told D.R. that Child's Mother had thrown him causing his ear injury. D.R. called Father and reported what Sibling told her.
In early March 2017, D.R. picked Sibling up from Father at a restaurant. Father brought Sibling out and Sibling was screaming. Sibling said Child's Mother accused Sibling of calling her a "bitch," tried to burn Sibling with a lighter, and tried to take Sibling's blanket from him. D.R. testified that she had never known Sibling to use a curse word.
Dawn Tish, investigator for the Missouri Department of Social Services, Children's Division, testified regarding a March 10, 2017, investigation into an allegation Sibling was being abused in Father's home.[6] Tish interviewed Father who denied Sibling was being abused in his home. Father admitted to domestic violence with Child's Mother, however, and alleged Child's Mother was the aggressor. Father confirmed that on one occasion Child's Mother hit him in the face with a frying pan, breaking his nose. He confirmed Sibling *614 and Child were present when domestic violence occurred within his home; Father would try to lead Child's Mother to another part of the home in these instances. Father admitted to one incident wherein he was deemed the aggressor. He reported that during an argument he became frustrated and threw a cup. The cup bounced off of a mattress and hit Child's Mother in the face; Father was arrested. Father told Tish that the argument started because he thought Child's Mother too strictly disciplined the children.[7] Tish testified that Child's Mother "may have had some bruising on her face when I saw her." Father also admitted to marijuana use.
Tish testified that, although many of the domestic violence incidents between the couple were unreported, the Independence Police Department had been called to the home on four occasions. When asked if Tish had concerns regarding Father's ability to protect his children, she testified: "He was very reluctant to be the enforcer.... He stated that he was afraid that [Child's Mother] would retaliate causing damage to either himself or his property." Tish was most concerned with Father's ability to protect Child because Sibling was only at Father's home on limited weekends; Child was at Father's home all of the time.
Tish was unable to interview Child as Child was afraid to talk to Tish and hid under a blanket.
Tish interviewed Child's Mother. Tish observed that Child's Mother became upset quickly, cried easily, insisted she was a victim, became agitated and animated, and engaged in a lot of "wailing and crying." Child's Mother admitted to using marijuana and Xanax. Child's Mother described Father as violent. She stated that Father once choked her until she lost control of her bladder. She reported that, in March 2017, Father purposefully hit her in the face with a mug as the two argued about proper discipline of the children.
Based on Tish's observations, she had concerns for Child's safety due to the domestic violence in the home, the emotional impact it could have on Child, and the potential for physical injury to Child if Child was in the midst of fighting. Tish expressed concern that drug use might "remove inhibitions that would keep the child safe and that there was possibly not someone who was not under the influence supervising a child at the time."
On May 4, 2017, the Juvenile Officer filed a petition alleging, among other things, Child was without proper care, custody and support due to Father's exposure of Child to domestic violence and because Father knew or should have known Child's Mother was abusing Sibling and failed to protect Sibling. Child was taken into temporary protective custody on that date. On May 9, 2017, a protective custody hearing was held. Child was ordered to remain in protective custody and in the temporary legal custody of the Children's Division for appropriate placement. An adjudication hearing was held August 14, September 25, and October 31, 2017. The court issued an order of adjudication on November 2, 2017, finding the allegations in the Juvenile Officer's petition proven. A dispositional hearing was held November 29, 2017. Child was committed to the custody of the Children's Division for appropriate placement. Father was ordered to comply with services to facilitate reunification with Child. Father appeals.[8]
*615 Standard of Review
We review juvenile adjudication proceedings under the standard applied in other court-tried civil cases and will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. In re A.G.R. , 359 S.W.3d 103, 108 (Mo. App. 2011). We consider the evidence in the light most favorable to the circuit court's ruling and ignore evidence to the contrary. Id.
Point I - Child's Need at Time of Hearing
In his first point on appeal, Father contends the circuit court erred in sustaining Count 2 of the Juvenile Officer's petition which alleged Child was in need of care and subject to the court's jurisdiction "because the trial court refused to consider evidence of the Child's need at the time of the hearing"[9] ; Father contends the circuit court misinterpreted Section 211.031[10] arguing Section 211.031 requires the court to consider Child's present needs. He contends the court erroneously focused only on evidence related to the allegations within the Juvenile Officer's petition, all of which occurred prior to the adjudication hearing. He concludes that "a determination of jurisdiction cannot be based solely on past events in and of themselves" and offers an interpretation of Section 211.031 that would require the court, prior to assuming "jurisdiction," to find a child is neglected or in need of care at the time of the adjudication hearing.
Our Eastern District addressed this same contention in In re J.B. , 58 S.W.3d 575, 580 (Mo. App. 2001) :
Parents argue that the trial court did not have jurisdiction because the allegations of neglect were in the past and the statute under which the petition was filed only confers jurisdiction over present neglect.
The trial court has exclusive original jurisdiction over proceedings involving a child alleged to be in need of care or treatment because the parents neglect or refuse to provide education which is required by law. Section 211.031.1(1)(a). Parents however, argue that because the statute used the present-tense word 'neglect,' the trial court has no jurisdiction in this case, which only alleges past neglect. Parents' argument is nonsensical. Of necessity, allegations of neglect are based on past actions. To rule otherwise would render the statute meaningless and void the family court's jurisdiction. Because we assume the legislature did not intend a meaningless act when enacting this statute, we find the trial court had proper jurisdiction over the proceedings involving Child.
The Missouri Constitution provides that "[t]he supreme court may establish rules relating to practice, procedure and pleading for all courts and administrative tribunals, which shall have the force and *616 effect of law[,]" but "[t]he rules shall not change substantive rights." Mo. Const. art. V, § 5. "Therefore, if there is an inconsistency on a substantive issue between a statute and a rule, the statute controls." State ex inf. Dykhouse v. City of Columbia , 509 S.W.3d 140, 147 (Mo. App. 2017). "[I]f the rule is procedural in nature, it will control unless expressly modified by the legislature[.]" Id.
Our Missouri Supreme Court has promulgated rules governing the scope of each Section 211.031 proceeding mandated by our legislature.[11] Statutorily mandated court hearings governed by the Rules include protective custody hearings, adjudication hearings, disposition hearings, and review hearings. With regard to adjudication hearings, Rule 124.06 provides, in relevant part: "At such adjudication hearing, the court shall determine what allegations in the petition or motion to modify are admitted and receive evidence on the allegations that have not been admitted." Rule 124.06.c. The Comment to Rule 124.06 states: "The purpose of the adjudication hearing is to determine whether the allegations in the petition are established."
If the court finds the allegations in the petition are not proven, the court must enter judgment denying the petition and, unless it has prior and continuing jurisdiction, release the child and "terminate jurisdiction." Rule 124.06.d. The reason it may be necessary to "terminate jurisdiction" in such instances is because, pursuant to Rule 123.01.b, "[t]he jurisdiction of the court attaches from the time the juvenile is taken into judicial custody." Where, as here, a child is in temporary protective custody pursuant to Rule 123.03 at the time of the adjudication hearing, the court already has "jurisdiction" over the child pursuant to Section 211.031.
Rule 123.01 provides instances where a child may be taken into "judicial custody" pursuant to Section 211.031. Within twenty-four hours after a child is taken into "judicial custody," the court must order the juvenile taken into "temporary protective custody" or released from "judicial custody." Rule 123.03. An order for temporary protective custody shall only be entered upon:
(1) the filing of a petition or motion to modify; and
(2) a determination by the court that probable cause exists to believe that:
(A) the facts specified in the petition or motion to modify bring the juvenile within the jurisdiction of the court under subdivision (1) of subsection 1 of section 211.031, RSMo ; and
(B) the conditions requiring judicial custody continue to exist.
Rule 123.04. Pursuant to Section 211.032.3 and Rule 123.04.c, a protective custody hearing shall be held within three business days of the date the child is taken into judicial custody to, among other things, determine if the child can be safely returned home prior to the adjudication hearing.
The adjudication hearing is to be held within sixty days of the date the child is taken into custody.[12] § 211.032.4. "The principles of procedural due process require that a parent in custody of a child over whom the juvenile court undertakes *617 to exercise jurisdiction for parental neglect under § 211.031 is entitled to timely notice in advance of hearing of the specific issues the parents must meet." In re Monnig , 638 S.W.2d 782, 787 n.3 (Mo. App. 1982). Parents must be given the specific factual allegations that will be considered at the hearing and sufficient advance notice to permit preparation for that hearing. In the Matter of Gault , 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). If the court finds at the adjudication hearing that sufficient cause exists for the child to remain in the custody of the State, the court conducts a separate dispositional hearing which addresses the physical and legal custody of the child in relation to the child's best interests. § 211.032.4; Rule 124.07.
Moreover, it is clear from Rule 124.06 that the adjudication hearing is solely to determine if the allegations in the petition or motion to modify have been proven, whether the evidence related to those allegations shows the juvenile in need of care and treatment, and whether the court thus has jurisdiction over the juvenile. Rule 124.06.e. We find no inconsistency between Section 211.031 and Rule 124.06. Rule 124.06 and related rules became effective in their present form on January 1, 2010. The sixty-day interim between judicial custody and the adjudication hearing is legislatively mandated in Section 211.032.4, last revised in 2004. This delay allows for parental notice and preparation.
The immediate circumstances of the child are considered by the court within the dispositional hearing. See C.S. v. Missouri Department of Social Services , 491 S.W.3d 636, 648 (Mo. App. 2016) ; Rule 124.07. If the dispositional hearing does not occur immediately after the adjudication hearing, the court must revisit any protective custody order and, among other things, consider whether continuation of the child in the home is contrary to the child's welfare. Rule 124.06.f and g. We note that, with regard to protective custody, the immediate circumstances of the child may be considered at any time. Rule 123.06.a provides that a juvenile in protective custody may be released if a change of circumstances makes continued protective custody unnecessary. Any party to the action may request such release. Rule 123.06.b. Nevertheless, while a change in the child's circumstances may allow release from protective custody and release of the jurisdiction conferred in Rule 123.01, a change in circumstances does not prevent the court from assuming jurisdiction upon adjudicating the allegations in the petition.
We find that the circuit court did not misapply Section 211.031 by assuming jurisdiction after considering evidence solely related to the allegations in the petition.
Point one is denied.
Point II - Sufficiency of the Evidence
In his second point on appeal, Father contends the circuit court erred in sustaining Count 2 of the Juvenile Officer's petition, which alleged Child was in need of care and subject to the court's jurisdiction, because there was insufficient evidence to prove Father abused or neglected Child. Father argues Child's Mother inflicted all abuse upon Child's sibling and the court "had a statutory duty to assess [Child's] need for state intervention in light of these facts." Father contends that the person responsible for Siblings injuries was no longer in the home thereby alleviating any danger to Child.
"To assert jurisdiction under Section 211.031.1(1), the juvenile or family court must find clear and convincing evidence that the child needs care because *618 the parent has neglected to provide the care necessary for the child's well-being." In re J.M. , 328 S.W.3d 466, 471 (Mo. App. 2010). "Neglect" is defined in Section 210.110 (12) as "failure to provide, by those responsible for the care, custody and control of the child, the proper or necessary support ... or any other care necessary for the child's well-being."
The circuit court found that Father knew or should have known that Child was being exposed to the physical abuse of Sibling, that Father exposed Child to domestic violence, and that Father failed to protect Child and Child's Sibling. The court found that the violence within Father's home impacted Child. The court found that Child's safety in Father's home could not be assured because Father failed or refused to address the physical abuse of Sibling, the domestic violence within his home, and the impact of these things on Child.
In 2014, when Sibling was only one year old and likely unable to vocalize any perpetrator of abuse, he was seen at Children's Mercy's SCAN Clinic after returning from Father's care with bruising and abrasions. Approximately seven months later, Sibling sustained bone fractures while in Father's home. Although Child was not yet born when this abuse occurred, because Sibling's injuries arose from and/or were alleged to have occurred in Father's home, Father was on notice as early as 2014 that something or someone within his home presented a danger.
Sibling was placed in foster care in 2014 after his fractured bones were discovered; the record does not state when he was released to parental custody. Child was born April 13, 2015. At some point in 2016, Child's Mother slapped Sibling across the face leaving a hand-sized bruise. Father refuted Sibling's account of the incident and asserted it never happened. In December 2017, Sibling told Father over the telephone that Child's Mother cut his penis with tweezers. Although Father said Sibling had come into his room in the middle of the night crying and Father did not know why, Sibling's report to the forensic examiner suggests Father knew more than he admitted. Sibling told the forensic examiner regarding the incident that, "My daddy just comed [sic]," "Like, daddy just talked to [Child's Mother]." Given that Sibling reported the specifics of this tweezer/penis event to D.R. as soon as D.R. inquired about the cut, to Father over the telephone when D.R. immediately called him, to a pediatric nurse practitioner, to a Children's Mercy pediatrician, and to a forensic examiner, it can reasonably be inferred that Sibling reported exactly what happened when he went to Father's room in the middle of the night crying. Father then "talked to" Child's Mother. Regardless, it is undisputed Sibling told Father about it over the telephone. Father took no action. Father never reported this incident to authorities, remained living with Child's Mother, and continued to subject Sibling and Child to Child's Mother's exclusive care.
After Father took no protective action after the penis/tweezer incident, Child's Mother threw Sibling on the floor causing an ear injury requiring eleven stitches. This incident occurred in late January or early February 2017. Contemporaneous to the injury, Father was informed it was the result of Child's Mother throwing Sibling. Father took no action. He did not alert authorities, remained living with Child's Mother, and continued to allow Child's Mother exclusive access to his children.
In late February/early March 2017, Father carried Sibling out of a restaurant while Sibling cried to D.R. that Child's Mother tried to burn him with a lighter. Around that time, Children's Services investigated *619 alleged abuse of Sibling by Child's Mother. An investigator met with Father March 10, 2017. Despite all of Sibling's prior reports, Father denied Sibling was being abused in his home. In the midst of the investigation, Father and Child's Mother remained a couple. Father admitted, however, that he knew of Child's Mother's abusive tendencies. He reported Child's Mother had broken his nose with a frying pan. He also admitted his unwillingness to stand up to Child's Mother for fear Child's Mother would retaliate by causing damage to Father or Father's property.
On March 20, 2017, police were called to Father's home after an incident of domestic violence; Father was arrested.
The evidence supports that Father provided no physical or emotional protection for Sibling. Father chose to ignore signs of abuse toward Sibling by Child's Mother and chose to ignore verbalizations of that abuse by Sibling. Notably, when Sibling was asked by the forensic examiner who he could confide in if he was hurt by someone, Sibling named only his mother. Given the severity of the abuse toward Sibling and the domestic violence Father exposed both Sibling and Child to, we cannot agree with Father that the evidence in this case was insufficient to establish Child was neglected or that "the link between [Child's Mother's] conduct toward Sibling and Father's responsibilities to Child is simply too attenuated to conclude that Father neglected Child."[13]
'The courts of this State have long admitted evidence of past conduct of the part of parents in determining the suitability of the parents to custody of their children.' In re D.L.W. , 530 S.W.2d 388, 391 (Mo. App. 1975) (holding that evidence from juvenile file indicating two siblings were taken from mother's custody seven and nine years prior to the events alleged was properly received at the dispositional hearing and was also admissible in the adjudicatory hearing). 'Evidence of mistreatment of other children has been held admissible in considering the welfare of another child.' Id. 'Prior abuse of another child is prima facie evidence of imminent danger to a sibling in the same circumstances so as *620 to justify intervention by the court for removal of the sibling from his environment.' In Interest of D.D.H. , 875 S.W.2d 184, 188 (Mo. App. S.D. 1994) ; see also In re A.A. , 533 S.W.2d 681, 684 (Mo. App. 1976) ; In Interest of W.J.D. , 756 S.W.2d 191, 196 (Mo. App. S.D. 1988) ; In re Interest of A.K.S. , 602 S.W.2d 848, 851 (Mo. App. W.D. 1980) ('The harm to a sibling, potential in the harm done to another child, is sufficient to justify intervention of the court to remove the sibling from the harmful environment.'). Cases of '[m]altreatment of a prior child present one of the few situations in which a juvenile court, and social agencies at its instance, can be alerted to take before-the-fact protective measures.' In re A.A. , 533 S.W.2d at 684.
In Interest of A.D.T. , 527 S.W.3d 916, 919 (Mo. App. 2017).
Father argues that he could not have been expected to take the abuse reported by Sibling seriously because Sibling's biological mother, D.R., delayed in reporting events to authorities and testified she was not always sure what to believe. Yet, this belies the fact that D.R. reported to Father every concerning incident as soon as she learned of it. Unlike Father, D.R. did not reside in Father's home with Child's Mother. Father was in the better position to recognize the truth in Sibling's allegations and the only parent in a position to protect Sibling from the torment occurring within Father's own home. Father's argument that, despite Sibling's reports of abuse Father could not have been expected to know the cruelty Child's Mother was inflicting on Sibling is, simply, unbelievable. This same woman broke Father's nose and blackened Father's eyes.
Father additionally argues that Father could not be found neglectful because Child's Mother and Father were no longer together at the time of trial, thus preventing any future observation by Child of domestic violence; further, there was no proof Father personally inflicted abuse on Sibling or Child. As noted above, Father's circumstances at the time of trial were irrelevant to adjudication.[14] Nevertheless, Father's arguments on appeal suggest he has yet to take responsibility for his role in Sibling's abuse and, in spite of knowing his children were scared of the domestic violence he subjected them to, continues to deny the domestic violence impacted the children. The statutorily required goal in most child protection cases is the safe return of children to parental custody. If and when Child is returned to these parents, co-parenting will be required regardless of whether the parents reside together. The evidence at trial was that Father fears Child's Mother and protected himself and his property over his children. The record is devoid of any evidence that Father can protect Child from domestic violence during co-parenting or that Father is able or willing to protect Child from any potential abuse.
We find substantial evidence in the record to support the circuit court's findings of clear and convincing evidence that Child is without proper care, custody and support necessary for her well-being and subject to the court's continued jurisdiction under Section 211.031.1. Substantial evidence in the record supports that Father knew or should have known that Child's Mother exposed Child to physical abuse of Sibling, and exposed Child to domestic violence. Substantial evidence supports the *621 court's findings that Father failed to protect Child from the dangers presented by Child's Mother and allowed the abuse of Sibling to continue by allowing Child's Mother unfettered access to Sibling. Substantial evidence supports the court's findings that Father's failure to address the abuse of Sibling, his own role in the domestic violence within his home, and its effects on Child prevent any assurance of the Child's safety in his care.
Point two is denied.
Point III - Reasonable Efforts Findings
In Father's third point on appeal, he contends the circuit court erred in finding reasonable efforts were made to prevent Child from being removed based on the needs of the family and Child pursuant to Section 211.183. He argues that the court's order lacks specificity, fails to outline its reasoning to support change of custody, and fails to explain why efforts to prevent removal failed and how those efforts were reasonable.
Section 211.183 provides in relevant part:
1. In juvenile court proceedings regarding the removal of a child from his or her home, the court's order shall include a determination of whether the children's division has made reasonable efforts to prevent or eliminate the need for removal of the child and, after removal, to make it possible for the child's return home. ...
3. In support of its determination of whether reasonable efforts have been made, the court shall enter findings, including a brief description of what preventive or reunification efforts were made and why further efforts could or could not have prevented or shortened the separation of the family. ...
5. Before a child may be removed from the parent, guardian, or custodian of the child by order of a juvenile court, excluding commitments to the division of youth services, the court shall in its orders:
(1) State whether removal of the child is necessary to protect the child and the reasons therefor;
(2) Describe the services available to the family before removal of the child, including in-home services;
(3) Describe the efforts made to provide those services relevant to the needs of the family before the removal of the child;
(4) State why efforts made to provide family services described did not prevent removal of the child; and
(5) State whether efforts made to prevent removal of the child were reasonable, based upon the needs of the family and child.
The court made the following reasonable efforts findings:
Continuation in the home is contrary to the welfare of the juvenile.
The efforts made to provide those services relevant to the needs of the family before removal of the juvenile included multiple meetings with the family, attempts to provide mental health assistance to the family, and team decision making.
Efforts made to provide family services described did not prevent removal of the juvenile because the risk of continuing physical abuse and domestic violence was on going.
Efforts made to prevent or eliminate the need for removal of the juvenile from *622 the home were reasonable based on the needs of the family and the juvenile.
Post-removal efforts of Children's Division were reasonable and included offer of psychological evaluation, psychiatric evaluation, substance abuse screening evaluation, individual therapy, drug testing and case management services.
The court found all prior orders not inconsistent to remain in effect; the court made reasonable efforts findings in each of its prior orders.
We find that the court's order includes all required Section 211.183 findings. Father's claims herein appear to focus not on the merits of these findings in relation to the evidence but on their specificity. To this extent, Father's arguments are waived. Rule 78.07(c) provides that, "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review." J.A.R. v. D.G.R. , 426 S.W.3d 624, 632 n.13 (Mo. banc 2014). No motion pursuant to Rule 78.07(c) was filed in this case.
Point three is denied.
Conclusion
We conclude that the circuit court did not misapply Section 211.031 by considering evidence solely related to allegations within the petition. Further, substantial evidence supported the court's conclusion that clear and convincing evidence showed Father knew or should have known Child's sibling was subjected to physical abuse, failed or refused to protect Sibling, continued to allow the abuser unfettered access to Sibling and Child in spite of this abuse, and engaged in domestic violence in the presence of Sibling and Child placing both at risk of harm. Finally, the circuit court included reasonable efforts findings pursuant to Section 211.183 in its judgment.
We affirm the circuit court's judgment.
All concur.

Child was born April 13, 2015. She was nearly two years old when the Juvenile Officer's petition was filed May 4, 2017. Child's half-sibling was born February 16, 2013, and was four years old at the time the petition was filed.

Divine testified at trial and the court found her testimony credible.

Killough testified at trial and the court found her testimony credible.

The court found Kunard's testimony credible.

The court found D.R.'s testimony credible.

The court found Tish's testimony credible.

Child's Mother reported the opposite; she stated the argument started because she became angry with Father for spanking the children.

Section 211.261.1 provides a parental right to appeal from "any final judgment, order or decree made under the provisions of this chapter which adversely affects him." The court's order of adjudication became final and appealable after the court issued its order of disposition. K.S.W. v. C.P.S. , 454 S.W.3d 422, 427 (Mo. App. 2015).

Father's statement, that the court refused to consider evidence of the Child's need at the time of the hearing, suggests Father attempted to introduce evidence the court rejected. Father introduced no evidence. If Father believed evidence pertinent to the adjudication hearing was erroneously excluded, an offer of proof, among other things, would have been necessary to preserve that issue for our review. See Kerr v. Missouri Veterans Commission , 537 S.W.3d 865, 877 (Mo. App. 2017). The rules of evidence apply at adjudication hearings. Rule 124.06.c.

All statutory references are to the Revised Statutes of Missouri as supplemented through 2016 unless otherwise noted.

See Section 211.032.3 wherein the legislature ordered our Missouri Supreme Court to promulgate rules for the implementation of protective custody hearings.

Pursuant to Rule 124.04, except for a protective custody hearing held pursuant to Rule 123.05, any hearing in a proceeding under Section 211.031.1(1) may be continued for good cause or compelling extenuating circumstances.

Father misconstrues In re S.F.M.D. , 447 S.W.3d 758 (Mo. App. 2014) (S.F.M.D. 1 ). Father quotes various instances of domestic violence noted within the case and states that "the evidence was insufficient to establish § 211.301 [sic] jurisdiction." This is inaccurate. The holding in S.F.M.D. 1 was that the circuit court failed to meet its statutory obligation under Section 211.181 to enter specific factual findings in support of its conclusion that S.F.M.D. was in need of care and treatment. Id. at 765. The lower court's failure deprived this court of any meaningful review of the Judgment. Id. On remand, the circuit court entered specific factual findings and the matter again came before this court on appeal. In reS.F.M.D. v. F.D. , 477 S.W.3d 626 (Mo. App. 2015) (S.F.M.D. 2 ). Having factual findings to guide our review, we determined that sufficient evidence supported the court's assumption of jurisdiction pursuant to Section 211.031.1. Id. at 641. As applicable to the domestic violence evidence we held:
We conclude that the trial court did not err in sustaining the allegations that Father and Mother abuse and/or neglect the child. The court articulated in its findings of fact and conclusions of law substantial evidence within the record to support the court's findings of abuse and neglect beyond that the child's injuries inexplicably occurred while in parental care and custody. Evidence of extreme violence within the household and in close proximity to the child during the time the child was injured, continued violence even after removal of the child from parental custody, Mother's return to Father only to engage in more violence, and both Mother and Father's denial of violence at trial, justified the court's findings of abuse, neglect, and the inability of the parents to protect the child and his welfare.
Id. at 643.

Regardless, the evidence Father points to in the record supporting that he and Child's Mother "went their separate ways" is D.R.'s testimony that Child's Mother "kicked [Father] out." This would suggest Father did not leave Child's Mother on his own accord or for the protection of his children.