

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FIVE

|  |  |  |
|---|---|---|
|  | ) | No. ED109487 |
|  | ) |  |
| IN THE INTEREST OF: T.D. | ) | Appeal from the Juvenile Court |
|  | ) | of Ste. Genevieve County |
|  | ) | Cause No. 20SG-JU00034 |
|  | ) |  |
|  | ) | Honorable Jerel L. Poor II |
|  | ) |  |
|  | ) | Filed: April 12, 2022 |

### Introduction

The juvenile officer filed a petition in the Circuit Court of Ste. Genevieve County requesting care and treatment of T.D., the minor child of M.R. ("Mother). Following an adjudication hearing, the circuit court entered judgment assuming jurisdiction over T.D. and granting temporary custody to the Children's Division. Mother appeals that the judgment (1) was not supported by substantial evidence and was against the weight of the evidence; (2) was based on facts not pleaded in the petition and not proved by clear and convincing evidence; and (3) was based on witness testimony that was not pleaded in the petition and was irrelevant. We affirm the judgment of the circuit court.

### Facts and Procedural Background

#### Pre-Hearing Procedure

T.D. was born on November 29, 2020, in Carbondale, Illinois, to Mother, a Missouri resident. Shortly after T.D.'s birth, an investigator from the Illinois Department of Children and Family Services ("DCFS") responded to hospital staff's concerns regarding the behavior of Mother and her paramour, C.D. DCFS determined Illinois would seek custody of T.D. if Missouri did not, due to major concerns about returning T.D. to Mother's custody. Thereafter, T.D. was taken into emergency protective custody by the Ste. Genevieve County, Missouri, Children's Division.

On December 1, 2020, a juvenile officer of the Ste. Genevieve County Circuit Court filed a petition asking the court to take jurisdiction of T.D. The petition referred to allegations of neglect and alleged that T.D. was "in need of care and treatment because the child is otherwise without proper care, custody or support," pursuant to Section 211.031.1(1)(b).[1] The petition stated that T.D. was taken into emergency protective custody on December 1, 2020, due to Mother's "highly inappropriate and uncooperative" behavior at the hospital following T.D.'s birth and Mother's "history with drug abuse and involvement with [the Children's Division]."

The petition further alleged that Mother had three pending charges for endangering the welfare of a child from a "co-sleeping incident" on April 1, 2020. In that incident, Mother's infant daughter, A.S., died while Mother was under the influence of methamphetamine and marijuana. The petition also asserted that Mother admitted doing a "speedball" (simultaneous use of methamphetamine and marijuana) and was "under the influence" on April 2, 2020.

The petition alleged that, following T.D.'s premature birth, Mother and C.D. were uncooperative with hospital staff and Illinois DCFS, and showed little interest in T.D. or his health concerns. The juvenile officer's petition concluded, "Due to the natural mother's drug abuse

---

[1] All Section references are to the Revised Statutes of Missouri (2016), as supplemented, unless otherwise indicated.

history, pending charges, lack of cooperation with hospital staff as well as DCFS in Illinois and lack of interest in the child, the child's safety could not be ensured."

On the same day, the circuit court entered an order for protective custody of T.D., finding probable cause to believe T.D. was within the court's jurisdiction under Section 211.031.1(1). The court ordered T.D. to remain in the custody of the Children's Division until further order.

On December 9, 2020, after a protective custody hearing, the court ordered that T.D. would remain in the custody of the Children's Division. In its order, the court granted Mother supervised visitation with T.D. The court also ordered an adjudication hearing on the juvenile officer's petition to be set in January 2021.

On January 5, 2021, Mother filed a motion asking the circuit court for findings of fact and grounds for its anticipated adjudication judgment, pursuant to Rule 73.01.[2] Among 26 questions posed to the court, the motion asked whether the actions of "another individual," E.F., in removing Mother's infant daughter, A.S., from her bassinet, placing A.S. in bed, and sleeping with A.S. on the night of A.S.'s death were acts of abuse or neglect by Mother.

The following evidence was adduced at the adjudication hearing on January 22, 2021.

Adjudication Hearing

On April 1, 2020, A.S. died from suffocation. Lt. Lance White of the Ste. Genevieve County Sheriff's Department investigated the death. He testified at the adjudication hearing that Mother, her three children, and another adult female, E.F., lived in a mobile home in Ste. Genevieve County. Lt. White learned from his investigation that E.F. acted as a caretaker for Mother's children and had always lived with Mother to help with the children.

---

[2] All Rule references are to the Missouri Supreme Court Rules (2021), unless otherwise indicated.

E.F. stated she regularly cared for A.S. and typically slept in the same bed with A.S. Caring for A.S. was primarily E.F.'s responsibility because Mother was "too invested" in her other children. E.F. had one child of her own, but she recently "gave away" the child to the father. E.F. did so because she was afraid her drug use would harm the child. Other witnesses, including E.F.'s aunt, corroborated this fact and Mother's knowledge of it.

Witnesses present the night of A.S.'s death informed Lt. White that Mother placed A.S. in her bassinet around 10 p.m., and Mother and E.F. went to sleep later that night or early the next morning. At some point after A.S. was placed in the bassinet, E.F., by her own account, removed A.S. from the bassinet and placed her in bed with E.F., Mother, and the other children. E.F. fell asleep on top of A.S., suffocating A.S. to death.

Lt. White determined that Mother and E.F. used illegal drugs on the night of A.S.'s death. A.S.'s father informed Lt. White that Mother called him but was too distraught to talk, so another woman talked on Mother's behalf. The woman told A.S.'s father that E.F. was under the influence of speedballs and killed A.S. Blood drawn from E.F. tested positive for amphetamine, methamphetamine, marijuana, and creatine. E.F. later confessed that she and Mother used speedballs on the night that A.S. died, and that the drugs facilitated A.S.'s death.

Shortly after A.S.'s death, the Children's Division requested a drug test of Mother. Mother tested positive for amphetamine, methamphetamine, marijuana, and creatine, the same substances used by E.F. Although the test could not identify the date of Mother's drug use, it confirmed that she used methamphetamine during the week of A.S.'s death. Lt. White confronted Mother about her drug use on the night of A.S.'s death. Mother neither confirmed nor denied using drugs, and instead demurred, "I don't know."

Based on his investigation, Lt. White recommended criminal charges to the prosecutor. Charges against Mother for endangering the welfare of all three children in the home on the night of A.S.'s death were pending at the time of the hearing.

Another witness at the adjudication hearing was a hospital social worker who talked with Mother shortly after the birth of T.D. The social worker testified that Mother admitted that A.S.'s death was caused by a friend who was under the influence and rolled over on A.S. The social worker considered Mother "at risk" due to her previous involvement with children's services. The social worker also had concerns about the behavior of C.D., Mother's paramour. C.D. appeared to be under the influence and "out of it" at the hospital. He was found asleep on the floor and had to be awakened by multiple nurses. Mother informed the social worker that C.D. was on probation for "cutting somebody's brake lines and [a] possible attempted murder charge." The social worker was concerned that Mother was planning to take T.D. home with C.D. Mother also exhibited uncooperative behavior, including covering her head with a blanket and refusing to answer questions.

An Illinois DCFS investigator also testified at the hearing. She responded to the hospital due to reports about the behavior of Mother and C.D. The investigator testified that, upon her arrival, Mother and C.D. were "difficult to engage." Mother was lying on the bed, facing away from the investigator, with a blanket over her head. C.D. was sitting next to the bed on his phone. Mother refused to speak with the investigator. C.D. did not engage with the investigator except to deny that he had been sleeping in the hallway.

After receiving the investigator's report, a DCFS child protective advanced specialist was assigned to T.D.'s case. The specialist testified that, shortly after the birth of T.D., Mother told her she last used methamphetamine in March 2020. Mother admitted to testing positive for

5

methamphetamine and marijuana at the time of A.S.'s death in April 2020. Mother also admitted that she did not engage in substance abuse treatment or counseling after the death of A.S.

The final witness at the hearing was Kelly McFarland, a Missouri children's service worker. McFarland managed Mother's supervised visitations with T.D. Mother's counsel objected that McFarland was not listed as a witness, the petition lacked any allegation about events occurring after T.D.'s birth, and McFarland's subjective view of the visitations was irrelevant. Counsel for the juvenile officer responded that McFarland had submitted multiple reports and McFarland's testimony was relevant to Mother's ability to care for T.D. The circuit court overruled the objections and allowed the testimony.

Over objection, McFarland testified to her "concerns" about the visitations. During two of the three visitations, Mother failed to bring any supplies or check T.D.'s diaper for changing. The day before the hearing, Mother asked McFarland to feed T.D. because Mother was frustrated, and McFarland had to show Mother how to feed him. McFarland testified that Mother was confused about how to feed T.D. without causing him to choke, despite that T.D. was her fourth child.

At the conclusion of the evidence, Mother's counsel moved for judgment in Mother's favor, arguing that counsel for the juvenile officer failed to prove the allegations in the petition, including that T.D. was abused or neglected. The circuit court denied the motion.

Judgment Assuming Jurisdiction

Following the hearing, the circuit court entered its judgment on February 19, 2021, assuming jurisdiction over T.D. The court concluded that T.D. was in need of care and found the following facts by clear, cogent, and convincing evidence.

T.D. was taken into emergency protective custody on or about December 1, 2020, due to highly inappropriate and uncooperative behavior of Mother and C.D., as well as Mother's history

6

of drug abuse and involvement with the Children's Division. Mother had pending charges for three counts of endangering the welfare of a child from the incident in which A.S. was killed while Mother was under the influence of methamphetamine and marijuana. Mother admitted to doing a speedball and was under the influence on April 2, 2020.

Mother exhibited a pattern of neglect for failing to supervise her children by allowing E.F. to care for the children while she and E.F. were under the influence of methamphetamine and marijuana. Mother routinely allowed E.F. to care for her children despite knowing of E.F.'s drug use and that E.F. placed her own child with relatives due to her drug dependence. Mother's failure to supervise A.S. resulted in A.S.'s death. Mother failed to receive drug and alcohol treatment or counseling following the death of A.S.

T.D. was born prematurely, and Mother showed little interest in T.D. or his health concerns. Mother and C.D. were uncooperative with hospital staff and Illinois DCFS. C.D. slept in the hallway during the birth, could not be readily awakened, and smelled of alcohol. Mother was unable to demonstrate her ability to properly care for T.D. in the supervised visitations, requiring children's service worker McFarland to feed T.D.

The court also made enumerated findings responding to the questions posed in Mother's Rule 73.01 motion. In its responses, the court repeated its findings regarding Mother's pattern of neglect, drug use, failure to supervise her children, and allowing E.F. to care for her children.

The court placed T.D. in the temporary custody of the Missouri Children's Division, established a permanency plan to ultimately return T.D. to Mother, and set a dispositional case review hearing a few weeks later.[3] This appeal follows.

---

[3] The February 19, 2021, judgment is a final, appealable order. *See* RSMo § 211.261.1 ("An appeal shall be allowed to a parent from any final judgment, order or decree made under the provisions of this chapter which adversely affects him.").

**Standard of Review**

This Court reviews juvenile proceedings under the same standard applied in other court-tried civil cases. *In re A.G.R.*, 359 S.W.3d 103, 108 (Mo. App. W.D. 2011). The judgment in a court-tried case will be sustained "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re A.R.V.*, 561 S.W.3d 817, 822 (Mo. App. E.D. 2018). We view the facts and reasonable inferences in the light most favorable to the judgment and accept them as true, and we disregard all evidence and inferences to the contrary. *Id.* at 823.

**Discussion**

Mother raises three points on appeal. First, Mother argues the judgment is not supported by substantial evidence and is against the weight of the evidence. Second, Mother argues the judgment is based on findings of facts not pleaded in the petition and not proved by clear and convincing evidence. Third, Mother argues that Kelly McFarland's testimony was not pleaded in the petition and was irrelevant. We address each point in order.[4]

<u>Point I</u>

When a juvenile officer files a petition alleging a child is in need of care and treatment under Section 211.031, the circuit court first conducts an adjudication hearing. *In re Y.S.W.*, 402 S.W.3d 600, 603 (Mo. App. E.D. 2013). At the adjudication hearing, the court determines whether the child is in need of care and treatment because the child is without proper care, custody, or support. *Id.*; RSMo § 211.031.1(1). The court may assume jurisdiction over the child only if it finds the allegations in the petition are proved by clear and convincing evidence. *Y.S.W.*, 402 S.W.3d at 603.

---

[4] All three of Mother's points on appeal are multifarious in violation of Rule 84.04(d). Given the gravity of this matter, we exercise our discretion to consider the points *ex gratia* where feasible.

If the court assumes jurisdiction over the child, then the court conducts a second, dispositional hearing. *Id.* At the dispositional hearing, the court determines what placement, treatment, and care are in the best interests of the child. *Id.* Ultimately, options range from returning the child to the custody of his parents to termination of parental rights. *See* RSMo §§ 211.459, 211.477. We find ourselves at the first, adjudication stage of this process.

Mother argues that the circuit court's judgment assuming jurisdiction over T.D. is not supported by substantial evidence, or any evidence for that matter, and is against the weight of the evidence. Mother's appellate briefs list hypothetical evidence that would support the judgment but is nowhere in the record. For example, Mother points to the lack of evidence that Mother harmed or mistreated T.D., and to the juvenile court's finding, in response to Mother's Rule 73.01 motion, of no evidence that Mother committed an act of abuse or neglect against T.D. To a lesser extent, Mother refers to evidence arguably contrary to the judgment, such as Mother's placement of A.S. in her bassinet on the night of her death, and that T.D. received standard medical treatment and was uninjured at the hospital.

This point combining substantial-evidence and weight-of-the-evidence challenges is improperly multifarious and, according to our precedent, best dismissed. *See Dieckmann v. JH Construction 2, LLC*, 619 S.W.3d 513, 522 (Mo. App. E.D. 2021) (citing *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014)). We are disposed to review the point in its entirety, but for another deficiency in Mother's weight-of-the evidence challenge. The challenge largely ignores the *Houston v. Crider* framework, pursuant to which appellants: (1) identify a challenged factual proposition that is necessary to sustain the judgment; (2) identify all favorable evidence in the record; (3) identify contrary evidence in the record, resolving all conflicts consistently with the circuit court's credibility determinations; and (4) demonstrate why the favorable evidence, in the

context of all the evidence, fails to induce belief in the factual proposition. 317 S.W.3d 178, 187 (Mo. App. S.D. 2010). This series of defects in Point I leaves us to review only Mother's substantial-evidence challenge.

Our standard of review requires us to sustain the judgment unless there is no substantial evidence to support it. *A.R.V.*, 561 S.W.3d at 822. We view the facts in the light most favorable to the judgment and accept them true, and we disregard all evidence to the contrary. *Id.* at 823. Mother's argument notwithstanding, we also disregard other, perhaps even more compelling evidence that theoretically would support the judgment but is not present in this case.

The question for the circuit court was whether T.D. was in need of care because he was without proper care, custody or support. *See* RSMo § 211.031.1(1)(b). At this early adjudication stage, the court need only find a failure to supply the child with the minimum quality of care tolerated by the community. *In re J.B.*, 472 S.W.3d 242, 250-51 (Mo. App. W.D. 2015); *In re G.C.*, 50 S.W.3d 408, 411 (Mo. App. E.D. 2001). The court, when faced with a potentially harmful situation, is not required to wait for actual harm to be inflicted on the child; it may act to prevent the deterioration of the child's situation. *J.B.*, 472 S.W.3d at 251; *G.C.*, 50 S.W.3d at 411.

Substantial evidence presented at the adjudication hearing proved, and the circuit court found by clear and convincing evidence, that Mother was uncooperative and uninterested in the health of T.D. after his premature birth. C.D. was apparently intoxicated, unresponsive, and asleep in the hallway. Mother contemplated bringing T.D. home with C.D. despite her understanding that C.D. was on probation for attempted murder. Mother had failed to engage in any drug treatment or counseling by the time of T.D.'s birth.

Underlying this is the tragic death of A.S., and Mother's failure to prevent it. Mother allowed E.F. to care for A.S. unsupervised even though Mother knew E.F. to abuse drugs. Mother

also knew that E.F. relinquished care of her own child due to her drug problem. The court found that Mother and E.F. were under the influence of drugs on the night that E.F. suffocated A.S. to death, and concluded that Mother's failure to supervise A.S. resulted in A.S.'s death.

This substantial evidence supported the juvenile court's judgment that T.D. was in need of care. Point I is denied.

## Point II

Mother argues in Point II that her due process rights were violated because the judgment is based on findings of facts not raised in the petition. *See* Mo. Const. art. I, §10 ("That no person shall be deprived of life, liberty or property without due process of law."); *Y.S.W.*, 402 S.W.3d at 604 (holding adjudication based on finding not raised in petition deprived Mother of due process rights to notice and opportunity to contest finding). More specifically, Mother points out that the petition did not mention E.F. or a pattern of neglect by Mother for allowing E.F. to care for her children.

Principles of procedural due process require a petition under Section 211.031 to provide timely notice of the specific issues to be met at the adjudication hearing. *In re Z.N.O.*, 566 S.W.3d 609, 616-17 (Mo. App. W.D. 2018). "Where, as here, a fundamental right is involved, this Court must be diligent to uphold the requirements of due process and protect the parent's fundamental liberty interest in the parent-child relationship." *In re D.L.W.*, 413 S.W.3d 2, 12 (Mo. App. E.D. 2012) (quoting *In re E.A.C.*, 253 S.W.3d 594, 601 (Mo. App. S.D. 2008)).

That said, Mother does not direct us to, and we cannot find, any indication in the record that this point is preserved for appeal. We review for trial errors, and there can be no review of a matter not presented to, or decided by, the trial court. *In re I.K.H.*, 566 S.W.3d 629, 631-32 (Mo. App. S.D. 2018). This is particularly so regarding procedural claims, which the trial court could

have remedied if given the chance, and constitutional claims, which are waived if not raised at the earliest opportunity. *Id.* at 632.

We nonetheless observe that, even if raised at the juvenile court, this procedural, constitutional claim would not have needed remedying. The petition alleged Mother's history with drug abuse and the Children's Division, her pending charges for endangering the welfare of a child, A.S.'s death, and Mother's drug use around that time, all of which inextricably involved E.F. and her caretaker role. The allegations put Mother on notice that the specific issues at the hearing would include, and the court would consider evidence related to, E.F. and Mother's practice of allowing E.F. to care for her children.

Also, Mother's Rule 73.01 motion requested findings directly related to E.F.'s removing A.S. from the bassinet, placing her in bed, and sleeping with her, and whether those acts amounted to abuse or neglect by Mother. Rule 73.01(c) states, "The court may, or if requested by a party shall, include in the opinion findings on the controverted material fact issues specified by the party." The rule is mandatory, and a court's failure to make the requested findings can be reversible error. *Pittman v. Hendricks*, 399 S.W.3d 918, 920 (Mo. App. E.D. 2013). The circuit court's findings regarding E.F., which Mother now deems gratuitous, were invited by Mother's motion and mandated by Rule 73.01(c).

Alternatively, Mother argues there was no clear and convincing evidence of a pattern of neglect, and the only basis for the judgment was the "one-time occurrence" of A.S.'s suffocation. *See Y.S.W.*, 402 S.W.3d at 603 (stating allegations in petition must be proved by clear and convincing evidence for circuit court to assume jurisdiction). Unlike Mother's due process claim, this claim was preserved in Mother's motion for judgment at the conclusion of the evidence.

As a matter of law, the court was not required to find a pattern of neglect to assert jurisdiction. *G.C.*, 50 S.W.3d at 411. Still, the evidence at the adjudication hearing proved, and the juvenile court found by clear and convincing evidence, that Mother engaged in a pattern of neglect for failing to supervise her children. Mother allowed E.F. to care for the children while she and E.F. were under the influence of drugs. She also routinely allowed E.F. to care for A.S. despite E.F.'s known drug use and E.F.'s placing her own child with relatives.

Other substantial evidence, including the "one-time occurrence" of A.S.'s death, also supported the court's judgment. Missouri courts long have held that prior harm to a child's sibling, and the potential for harm to the child in the same circumstances, may justify intervention by the court to remove the child from the harmful environment. *In re A.D.T.*, 527 S.W.3d 916, 919 (Mo. App. E.D. 2017); *In re A.A.*, 533 S.W.2d 681, 684 (Mo. App. 1976). Indeed, cases involving prior maltreatment of a sibling present one of the few situations in which a circuit court may take preemptive measures to protect another child. *A.D.T.*, 527 S.W.3d at 919; *A.A.*, 533 S.W.2d at 684. Here, we have the extreme case of the killing of T.D.'s sibling, infant A.S., just eight months before T.D.'s premature birth. The circumstances of A.S.'s death and the other evidence of the potential for severe harm to T.D. were sufficient for the court to intervene at this adjudication stage.

Point II is denied.

Point III

For her third and final point, Mother argues that children's service worker Kelly McFarland's testimony, and the court's finding of Mother's inability to care for T.D. during supervised visitations, violated Mother's due process rights. Mother argues, similarly to Point II,

13

that the petition omitted any allegation regarding the supervised visitations. Mother contemporaneously objected to McFarland's testimony on this basis.

Counsel for the juvenile officer correctly conceded at oral argument that the petition did not contain any allegation providing notice of the specific issue of Mother's inability to care for T.D. at the visitations, as witnessed by McFarland. *See Z.N.O.*, 566 S.W.3d at 616-17. In this respect, Mother was not given the process she was due. But she also was not prejudiced. The testimony was brief and was not the only evidence of Mother's inability to care for T.D. With or without the court's finding that Mother was unable to demonstrate her ability to care for T.D. in the visitations, the judgment was supported by substantial evidence.

Finally, Mother argues that McFarland's testimony should have been excluded because it consisted of "subjective observations" and was irrelevant. Given our resolution of the due process issue regarding the same testimony, and that this point is multifarious, we need not address this evidentiary issue. Point III is denied.

### Conclusion

For the forgoing reasons, the judgment of the circuit court is affirmed.

Cristian M. Stevens, J.

Sherri B. Sullivan, C.J., and
Michael E. Gardner, J., concur.

14